SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,

v.

John Milton ADDISON, Miles A. White,
John R. Metz, Dan Nance, White, Green
& Addison Associates, Inc., Trans-World
Mining Corporation, Murchison Ven-
tures, Inc., Defendants.

Civ. A. No. 8224.

United States District Court
N. D. Texas,
Dallas Division.

June 2, 1961.

710

Lester May, Dallas, Tex., for defendants.

C. W. Aston, Fort Worth, Tex., for plaintiff.

DAVIDSON, District Judge.

This action came on for hearing before the Court on May 22, 1961, and the Court having considered the pleadings and motions filed herein, and after having considered the evidence submitted by the respective parties, and the Court now having entered Findings of Fact and Conclusions of Law to the effect that the evidence sustains the allegations of each count of the amended complaint for injunction, and the Court having found that the Securities and Exchange Commission is entitled to a final judgment permanently enjoining the defendants John Milton Addison; Miles A. White; John R. Metz; Dan Nance; White, Green & Addison Associates, Inc.; Trans-World Mining Corporation; and Murchison Ventures, Inc. from engaging in acts and practices which constitute or will constitute violations of Sections 5(a) (1), 5(a) (2), 5(c), 17(a) (2) and 17(a) (3) of the Securities Act of 1933, as amended (15 U.S.C.A. §§ 77e(a) (1), 77e (a) (2), 77e(c), 77q(a) (2) and 77q(a) (3) ) for the reason that unless so enjoined the said defendants will continue their acts and practices set forth in plaintiff's verified amended complaint, resulting in continuation of the aforesaid violations of the said Act, and it appearing that the Court has jurisdiction of the parties hereto and the subject matter hereof

1. It is ordered, adjudged and decreed, as of 22nd day of May, 1961, that the defendants John Milton Addison; Miles A. White; John R. Metz; Dan Nance; White, Green & Addison Associates, Inc.; Trans-World Mining Corporation; and Murchison Ventures, Inc., their officers, agents, employees, attorneys, successors, and assigns, and each of them, and all persons acting in concert or participation with them, be and they hereby are permanently enjoined from, directly or indirectly—

a) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, namely notes, evidences of indebtedness, participations in profit-sharing agreements, investment contracts and fractional undivided interests in oil, gas and other mineral rights, or any other securities, through the use or medium of any prospectus or otherwise; and

b) carrying such securities or causing them to be carried through the mails or in interstate commerce by any means or instruments of transportation for the purpose of sale or delivery after sale; unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities;

c) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell any such securities through the use or medium of any prospectus or otherwise, unless and until a registration statement has been filed with the Securities and Exchange Commission as to such securities or while a registration statement filed with the Securities and Exchange Commission as to such securities is the subject of a refusal order or stop order of the Securi-

ties and Exchange Commission or (prior to the effective date of a registration statement) any public proceedings or examination under Section 8 of the Securities Act of 1933, as amended;

provided that the foregoing shall not apply to any security or transaction which is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended.

2. It is further ordered that the defendants John Milton Addison; Miles A. White; John R. Metz; Dan Nance; White, Green & Addison Associates, Inc.; Trans-World Mining Corporation; and Murchison Ventures, Inc., their officers, agents, employees, attorneys, successors and assigns, and each of them, and all persons acting in concert or participation with them, be and they are hereby permanently enjoined from, directly or indirectly, in the offer for sale or selling securities, namely notes, evidence of indebtedness, participations in profit-sharing agreements, investment contracts and fractional undivided interests in oil, gas and other mineral rights, or any other security, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading concerning—

a) the efficacy of the Benson Upgrader;

b) the supply or market for upgraded uranium-bearing material, uranium ore or yellow cake, and proven reserves of low-grade uranium-bearing deposits;

c) the cost of equipment and other factors necessary to produce uranium concentrate (known as yellow cake) on a commercially profitable basis;

d) the making of yellow cake with the Benson Upgrader or with component parts added thereto;

e) the factors determining the amenability of low-grade, uranium-bearing deposits to mechanical up-grading;

f) the profit possibilities of the defendants' ventures or the profit possibilities offered to persons making loans to the defendants or their agents;

g) the timber rights of the defendants;

h) the extent of the defendants' holdings (mineral and otherwise), the status of the defendants' title thereto and the cost of retaining and perfecting title thereto;

or any other untrue statement or omission of similar purport or object.

3. It is further ordered that the defendants John Milton Addison; Miles A. White; John R. Metz; Dan Nance; White, Green & Addison Associates, Inc.; Trans-World Mining Corporation; and Murchison Ventures, Inc., their officers, agents, employees, attorneys, successors and assigns, and each of them, and all persons acting in concert or participation with them, be and they are hereby permanently enjoined from, directly or indirectly, engaging in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon purchasers of securities from them, and particularly from engaging in any of the acts and practices set forth in paragraph 2 of this judgment or of similar purport or object.

It is further ordered, that a copy of this final judgment, together with a copy of the Findings of Fact and Conclusions of Law filed herein, be served by the United States Marshal for this District upon each of the defendants and also upon the following persons who acted in concert and participated with them in engaging in the acts and practices described in the amended complaint, Robert C. Olson, William D. Groom, James D. (Bob) Scoggins, Agnes M. Carver, and Martin Addison.

### Findings of Fact and Conclusions of Law.

A brief history of this case since the filing of the complaint will serve a useful

purpose in making these Findings of Fact and Conclusions of Law.

On June 30, 1959, the plaintiff herein, the Securities and Exchange Commission, filed in this Court a verified complaint alleging that the defendants, John Milton Addison; Miles A. White; John R. Metz; Dan Nance; White, Green & Addison Associates, Inc.; Trans-World Mining Corporation; and Murchison Ventures, Inc., since some time during the year 1955, had been and were then selling and offering to sell "securities" (as that term is defined in Section 2(1) of the Securities Act of 1933, 15 U.S.C.A. § 77b(1) ), namely, notes, evidences of indebtedness, participations in profit-sharing agreements, investment contracts, and fractional undivided interests in oil, gas and other mineral rights. The verified complaint also alleged that the defendants had been and were using the mails and instruments of transportation and communication in interstate commerce in selling and offering to sell such securities, and in carrying and causing such securities to be carried for the purpose of sale and delivery after sale in violation of the registration provisions of the Securities Act of 1933 (Sections 5(a) (1), 5(a) (2), and 5(c)—15 U.S.C.A. § 77e(a) (1), 77e(a) (2) and 77e(c)) because no registration statement with respect to such securities had been filed or was in effect with the Securities and Exchange Commission.

The verified complaint alleged that unless restrained and enjoined the defendants would continue to engage in such acts and practices in violation of the aforesaid registration provisions of the Securities Act of 1933. The complaint prayed for a temporary restraining order, a preliminary injunction, and a final judgment restraining and enjoining the defendants from continuing such alleged violations and from dissipating or disbursing the funds and assets of the defendants, particularly all payments received from sales of the aforesaid securities. The plaintiff filed with its verified complaint a motion for a temporary restraining order and an affidavit in support thereof. Based upon the verified complaint and the affidavit supporting plaintiff's motion for a temporary restraining order, this Court issued a temporary restraining order on June 30, 1959, restraining the defendants and their agents from continuing the acts and practices described in the complaint and also restraining them from dissipating or disbursing the funds and assets of the defendants, particularly all payments received by them from sales of the aforesaid securities on the grounds that all such sales were made by the alleged unlawful acts and practices described in the complaint, and that the purchasers of such securities had the right to rescind their purchases and to demand return of their monies paid for such securities in accordance with their rights of redress provided in Section 12 of the Securities Act of 1933 (15 U.S. C.A. § 77l).

Plaintiff's motion for a preliminary injunction was heard before this Court on July 10, 1959. All defendants filed answers and appeared in person at the hearing and were represented by their attorneys. After considering the pleadings and motions filed herein and after having heard and considered the evidence submitted by the respective parties, which included the oral testimony of several defense witnesses, and the oral testimony of defendant Addison, this Court on July 10, 1959, issued a preliminary injunction enjoining the defendants and their agents from continuing to offer for sale, sell or cause to be delivered after sale the aforesaid securities by use of the mails and instrumentalities in interstate commerce in violation of the aforesaid registration provisions of the Securities Act of 1933.

The preliminary injunction also enjoined the defendants and their agents from dissipating or disbursing the funds and assets of the defendants, particularly all payments received from sales of the aforesaid securities. The preliminary injunction also ordered that there be impounded in the custody of the United States Marshal for this District, until

further order of this Court, a certain brief case and the contents thereof which were introduced in evidence at the hearing on plaintiff's motion for a preliminary injunction. The brief case belonged to the defendant Addison and the contents thereof, consisting of cashier's checks, bank money orders, and American Express money orders in the amount of $125,700, and personal checks in the amount of $20,925, represented monies the defendants had obtained from sales of the aforesaid securities in violation of the aforesaid registration provisions of the Securities Act of 1933. Findings of Fact and Conclusions of Law on which the preliminary injunction was based were filed herein on July 20, 1959.

On September 9, 1959, the plaintiff, with leave granted by this Court, filed an amended verified complaint for an injunction against the same defendants. The amended complaint realleged all allegations made in the original complaint and in addition thereto alleged that the defendants in offering for sale and selling the same securities described in the original complaint, had been and were violating the anti-fraud provisions of the Securities Act of 1933 (Sections 17(a) (2) and 17(a) (3)—15 U.S.C.A. § 77q(a) (2) and 77q(a) (3) ), in that the defendants had been and were obtaining money and property by means of specifically alleged untrue statements of material facts and by specifically alleged omissions to state material facts, the disclosure of which was alleged to be necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The amended complaint further alleged that in making sales of the aforesaid securities, the defendants had been and were engaging in transactions, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities in that the defendants had been and were obtaining money and property in the sale of such securities by means of specifically alleged untrue statements of material facts and concealments of material facts.

The amended complaint also alleged that the defendants had sold approximately $1,000,000 of the securities described therein to approximately 400 persons residing throughout the United States in violation of the aforesaid registration and anti-fraud provisions of the Securities Act of 1933, that the purchasers of such securities were afforded a statutory remedy under Section 12 of the Securities Act of 1933 (15 U.S.C.A. § 77l), to recover from the defendants the purchase price paid for such securities and that one purchaser had already intervened in this case for that purpose; that the United States Internal Revenue Service had levied a jeopardy tax assessment against the defendant Addison in an amount approximating $125,000 and would likely intervene in this case for the purpose of asseting such assessment and obtain a substantial part of the aforesaid funds impounded in the custody of the United States Marshal[1]; that the defendants' liabilities substantially exceeded their assets; that the defendants had already granted preferences to certain creditors while in a hopelessly insolvent condition; and that the Court should not be called upon in this case to determine the rights of the divergent claimants against the defendants.

The amended complaint prayed for the appointment of a permanent receiver to take over the funds and assets of the defendants, including the aforesaid funds impounded in the custody of the United States Marshal with authority to distribute such funds and assets ratably among the persons rightfully entitled thereto as determined by this Court and that the defendants be permanently enjoined from dissipating or disbursing the funds and assets of the defendants, particularly all monies received from sales of the aforesaid securities. The amended complaint also prayed that the defendants be permanently enjoined from further violations of the aforesaid registration

---

1. The Internal Revenue Service did intervene for this purpose.

and anti-fraud provisions of the Securities Act of 1933.

On February 23, 1960, a Petition in Involuntary Bankruptcy was filed in this Court against the defendant Addison, No. 4781 In Bankruptcy. A receiver was appointed April 27, 1960 and the defendant Addison was adjudicated a bankrupt on June 27, 1960. On July 19, 1960, an order was entered and filed in this injunction case, Civil Action No. 8224, brought by the Securities and Exchange Commission, directing the United States Marshal, in whose custody the aforesaid brief case and funds totalling $146,625 had been impounded on July 10, 1959, to deliver to the Receiver in the bankruptcy case, the aforesaid brief case and funds contained therein.

On May 16, 1960, all defendants in this injunction case, Civil Action No. 8224, (except Dan Nance), were jointly indicted along with Robert C. Olson, William D. Groom, James D. (Bob) Scoggins, and Agnes Carver, in this Court on charges of violating the anti-fraud and registration provisions of the Securities Act of 1933, the Mail Fraud Statute, 18 U.S.C.A. § 1341, and the Conspiracy Statute, 18 U.S.C.A. § 371. The docket number of the criminal case is 15,712. The allegations contained in the indictment and in the aforesaid amended complaint for a permanent injunction are substantially the same. In the criminal case the defendants Agnes Carver; White, Green & Addison Associates, Inc.; Trans-World Mining Corporation; and Murchison Ventures, Inc., were granted severance. Trial of the criminal case began before this Court on January 23, 1961, and was concluded on February 17, 1961. The jury returned their verdict of guilty as to all defendants that stood trial on all counts submitted charging violations of the anti-fraud provisions of the Securities Act, the Mail Fraud Statute, and the Conspiracy Statute, and acquitted the defendants on the counts charging violations of the registration provisions of the Securities Act. The acquittal on those counts does not, of course, determine the issue in this injunctive action as to whether the defendants named in the amended complaint did or did not violate the registration provisions of the Securities Act or whether they should or should not be enjoined. Sentences have been imposed in the criminal case and the defendants have filed notices of appeal.

There was filed in this injunction action on April 27, 1961, a Stipulation by which the respective parties, through their attorneys of record, agreed that at the hearing to be held in this Court on plaintiff's motion for a final judgment permanently enjoining the defendants as prayed for in the plaintiff's amended complaint that this Court may take notice of and that there may be incorporated in the record the testimony and all exhibits received in evidence in the trial of the aforesaid criminal case, No. 15,-712, conducted before this Court in January and February 1961.

Plaintiff's verified amended complaint having come on for hearing before this Court on May 22, 1961, and the Court having considered same and having also considered the testimony and all exhibits which this Court admitted in evidence in the trial of the aforesaid criminal case, No. 15,712, in January and February 1961, and the testimony of all witnesses at the hearing held before this Court on plaintiff's motion for a preliminary injunction, makes the following Findings of Fact and Conclusions of Law based thereon and independent of the jury verdict in the aforesaid criminal case.

### Findings of Fact

1. Commencing some time during the year 1955 and continuing until at least some time in May, 1960, the defendants John Milton Addison; Miles A. White; John R. Metz; Dan Nance; White, Green & Addison Associates, Inc.; Tran-World Mining Corporation; and Murchison Ventures, Inc.; and other persons acting in concert and participation with them, sold and offered to sell securities, namely, notes, evidences of indebtedness, participations in profit-sharing agreements, and investment contracts. Dur-

ing said period of time the defendants, directly and indirectly, made use of means and instruments of transportation and communication in interstate commerce and of the mails to sell and offer to sell such securities and, directly and indirectly, carried such securities and caused them to be carried through the mails and in interstate commerce by means and instruments of transportation for the purpose of sale and delivery after sale.

2. No registration statement with respect to the securities described in paragraph 1 hereof has been filed or is in effect with the Securities and Exchange Commission.

3. Robert C. Olson, William D. Groom, James D. (Bob) Scoggins, Agnes M. Carver, and Martin Addison, acted in concert and participated with the defendants in engaging in the acts and practices set forth in these findings of fact.

4. The offerings and sales of the securities described herein arise from and are the result of the defendants' hereinafter described activities in soliciting and obtaining loans of money and property from the public for the stated purpose of financing the defendants' mining operations.

5. Commencing some time during the year 1955 and continuing until at least some time in May 1960, the defendants John Milton Addison; Miles A. White; John R. Metz; Dan Nance; White, Green & Addison Associates, Inc.; Trans-World Mining Corporation; and Murchison Ventures, Inc.; and other persons acting in concert and participation with them, solicited and obtained loans of money and property in the name of the defendant, John Milton Addison, from well over a thousand persons residing in various states throughout the United States, including the State of Hawaii. The aggregate amount of such loans of money obtained exceeded a million dollars.

6. In soliciting and obtaining such loans the defendants represented they had acquired mining claims and mining leases on thousands of acres of land situated in several western states; that on some of their mining properties there were large and rich deposits of uranium ore and that there were vast amounts of unmarketable low-grade uranium deposits on their other properties and throughout the United States; that the defendants had acquired a machine called the Benson Upgrader which would upgrade low-grade unmarketable uranium deposits to a marketable commercial uranium ore; that the Benson Upgrader, by adding certain component parts thereto, would produce "yellow cake," a uranium concentrate which is the end product produced by the multi-million-dollar uranium processing mills licensed by the Atomic Energy Commission; that profits running into millions of dollars per year would be made in mining, upgrading, milling and selling such ore and concentrates, and in the operation of other valuable properties owned by the defendants; that the defendants needed money to get into operation and that in order to finance such operations, they were soliciting unconditional unsecured loans of money from members of the general public to the defendant Addison, which would be repaid one year from date, plus interest, and that persons making such loans would participate in the millions of dollars of profits the defendants would make from their mining and other operations; that such profits would be distributed to the lenders not in consideration of, or in exchange for, having made the loan, but only by reason of the defendants' extreme gratitude for the extraordinary friendship the lenders had for, and had manifested in, the defendants and that the extent to which the lenders would participate in such profits rested solely within the discretion of the defendant Addison and would be measured and determined by the lenders' continued faith, loyalty, trust and confidence in the defendants, but that the more money each person loaned to the defendants the better it would be for the lender, and the better it would be for

the defendants. The loan transactions involved an investment of money by the lenders in the defendants' enterprises whereby the lenders were led to expect profits through the efforts of the defendants.

7. In accordance with representations made in soliciting and obtaining such loans the defendants, in most instances, issued and delivered to the lenders personal loan notes, signed by the defendant Addison, in the amount of such loan, bearing interest at the rate of 10 per cent per annum and payable twelve months from date of such loan.

8. With respect to some of the more recent loans solicited and obtained, the defendants represented to such lenders that the lenders would participate and share in the millions of dollars of profits which would be made from the operations of the defendants' various ventures in addition to being repaid the amount loaned in one year plus interest, but the defendants did not issue or deliver to these more recent lenders a note or any other instrument in writing evidencing such loan transaction or the promised participation and sharing in the profits to be made.

9. In soliciting and obtaining such loans the defendants represented in some instances by means of written agreements delivered to the lenders, that the defendants would cause contracts to be executed by which there would be conveyed to lenders for a specified number of years, a percentage interest in the income and profits that would be derived from the defendants' mining properties and operations.

10. The defendants employed persons residing throughout the United States on a non-salaried basis to work on their mining properties and promised such non-salaried workers, some of whom worked for the defendants for several months, that they too would share and participate in the millions of dollars of profits which would be made from the operations of the defendants' various ventures by reason of the defendants' extreme gratitude for such non-salaried

workers' extraordinary friendship in rendering such services. The defendants, however, did not issue or deliver to these non-salaried workers any instrument in writing evidencing their right to share and participate in the profits to be made. The non-salaried workers gave the defendants their services whereas the lenders gave the defendants money, but in all other respects the dealings and understandings of the non-salaried workers and the lenders with the defendants were substantially the same in that the lenders and the non-salaried workers were both promised that they would share and participate in the profits to be made.

11. In offering for sale and selling the securities described in paragraph 1 hereof, and in the manner and during the period of time stated therein, the defendants stated to purchasers and prospective purchasers of such securities— with respect to their uranium operations:

(1) That the defendants owned a portable machine called the "Benson Upgrader," including all patent rights thereto, which would up-grade per day from 1,000 to 1,500 tons of low-grade, unmarketable uranium-bearing deposits to a marketable commercial uranium ore;

(2) That the defendants owned mining claims and rights to mine on over 300,000 acres of land situated in five western states in the general area of Colorado, containing millions of tons of low-grade unmarketable uranium-bearing deposits; that there are many additional thousands of acres of land in the United States containing milions of tons of low-grade unmarketable uranium-bearing deposits;

(3) That the Benson Upgrader would up-grade these low-grade, unmarketable uranium-bearing deposits at ratios of five to one, seven to one, and at higher ratios, thereby making the end product, through such up-grading process, a marketable commercial uranium ore;

(4) That these millions of tons of low-grade, unmarketable uranium-bearing deposits throughout the United States have not been mined heretofore because there has been no upgrader which would

upgrade same to a marketable commercial uranium ore but that with the Benson Upgrader all of the material can be upgraded to a marketable commercial uranium ore;

(5) That the defendants would manufacture additional Benson Upgraders and lease same on a royalty basis to independent mining operators owning the aforesaid large amounts of low-grade, unmarketable uranium-bearing deposits, thereby enabling the upgrading of vast amounts of such low-grade, unmarketable uranium-bearing deposits to a marketable commercial uranium ore;

(6) That the defendants would make millions of dollars by up-grading unmarketable, low-grade uranium-bearing deposits to marketable commercial uranium ore with their Benson Upgrader and from royalties they would realize by making additional Benson Upgraders and leasing same to independent mining operators owning large amounts of low-grade, unmarketable uranium-bearing deposits, who would up-grade same with Benson Upgraders to marketable commercial uranium ore;

(7) That the Benson Upgrader has been tested and proven to operate successfully and is the only upgrader that will up-grade low-grade, unmarketable uranium-bearing material to a marketable commercial uranium ore;

(8) That all marketable commercial uranium ore produced in the United States is sold to and goes through one of the approximately eighteen or more uranium mills located throughout the western part of the United States, each of which mills cost millions of dollars;

(9) That these mills buy only commercial uranium ore, and their job is to convert this ore into "yellow cake" (otherwise known as uranium concentrate), the product which they sell to the Atomic Energy Commission;

(10) That each of these eighteen or more multi-million-dollar uranium mills, by using the Benson Upgrader on the commercial uranium ore they buy, can up-grade such commercial ore at least by seven times, thereby increasing their daily capacity of "yellow cake" seven times or more, which will result in these mills making millions of additional dollars, and that the defendants expect to get half of the millions of dollars the mills make by using the Benson Upgrader;

(11) That defendants' ownership and control of the Benson Upgrader and of all patent rights thereto assures the defendants of receiving a per cent of virtually all marketable commercial uranium ore produced in the United States;

(12) That the Benson Upgrader is revolutionizing the uranium industry;

(13) That the Benson Upgrader cost the defendants about $65,000 and that the defendants can construct a Benson Upgrader about every thirty days;

(14) That the Benson Upgrader, by adding certain component parts thereto which cost approximately $100,000, will produce "yellow cake" technologically better than a $15,000,000 uranium mill, "yellow cake" being the end product made by the multi-million-dollar uranium mills, which is purchased by the Atomic Energy Commission;

(15) That the Benson Upgrader, with the necessary component parts to make "yellow cake," can be operated by five men in contrast to the one hundred men required to operate one of the multi-million-dollar uranium mills;

(16) That one Benson Upgrader, with its "yellow cake" making component parts, will net the defendants $86,000 per day operating at only two-thirds of its capacity;

(17) That it is a matter of common knowledge that the Benson Upgrader, with its "yellow cake" making component parts, will replace the multi-million-dollar uranium mills;

(18) That the United States has been importing 82 per cent of its uranium requirements for defense from the Belgian Congo, and the supply cannot catch up with the demand in the next hundred years just on our peacetime needs;

(19) That it was because of the defendants ownership and control of the Benson Upgrader and the patent rights thereto and the fact that this Benson Upgrader would revolutionize the uranium industry and replace the multi-million-dollar uranium mills that big business interests and unscrupulous agents of county, state and federal governments were harassing and opposing the defendants in their efforts to borrow money to finance their operations, and were involving the defendants in litigation in various courts;

(20) That the defendants needed additional money to get into operation and that they were soliciting unconditional unsecured loans of money to the defendant John Milton Addison, for periods mostly of one year, for which a promissory note in the amount lent, bearing ten per cent interest per annum, would be issued to the lender by the defendant John Milton Addison, with the understanding that the defendant Addison could take such money lent to him and throw it away, give it away, burn or tear it up or do with it as he saw fit, but that the more money each person lent to the defendant Addison the better it would be for such lender and the better it would be for the defendant;

(21) That the defendants would not ask to borrow money if they did not need it to get into operation, and that the defendants would give to each person who lent money to the defendant Addison an interest in their ventures, and that said interest would, through the efforts of the defendants, make the lenders wealthy, but that such interest would be a "gift" out of the defendants' gratitude and not as consideration for making the loan, and that from the standpoint of the lender this was better than being a stockholder;

(22) That the defendant Addison would obtain or apply for a life insurance policy in an amount equal to the amount of money lent by each lender and that the lender would be made the beneficiary of such policy;

(23) That as soon as the defendants could get their Benson Upgrader into production the financial problems of the defendants and the lenders would end;

(24) That after obtaining loans from members of the general public, the defendants prevailed upon such lenders to sign affidavits, denying therein that they had been told they would receive an interest in the defendants' ventures, by representing that such affidavits were necessary for the protection of the defendant Addison and that failure to sign the affidavits would result in the lenders not receiving an interest in the defendants' ventures and that, should the lenders thereafter make controverting affidavits or testify in any legal proceeding against the defendants contrary to the affidavits given the defendants, this would constitute the offense of perjury or false swearing;

When in fact the defendants omitted to state in connection with making the statements set forth in sub-paragraphs (1) to (24), inclusive, of paragraph 11—

(a) That the number of tons of low-grade uranium-bearing deposits, as well as the number of tons of commercial uranium-bearing deposits, that could be up-graded per day by the Benson Upgrader depend upon the amenability of such deposits to the up-grading process; that some of the principal factors which determine the amenability of such deposits to up-grading by the Benson Upgrader are the type and physical characteristics of the deposits and that, unless a deposit of low-grade uranium-bearing material or a deposit of commercial uranium-bearing material is suitably amenable to such up-grading process, efforts to up-grade such deposits are generally fruitless and unprofitable.

(b) That there is no assurance that the purported millions of tons of low-grade uranium-bearing deposits located throughout the United States are suitably amenable to up-grading by the Benson Upgrader to a marketable commercial uranium ore on a profitable basis.

(c) That for many years several large manufacturers of mining and milling equipment have manufactured, publicly

advertised and sold milling equipment known as classifiers, crushers and roller and ball mills, which are used in a washing and scrubbing process to separate finely ground mineralized coated material from sand, the basic operating principles of which are the same as the defendants' Benson Upgrader; that the crushers and mills comprising a part of the Benson Upgrader were manufactured by some of these old established manufacturers of mining and milling equipment and that the classifier which comprises a substantial part of the Benson Upgrader was copied from the "Aikens Classifier," which has been manufactured and publicly marketed for years by an old established manufacturer of mining and milling equipment.

(d) That defendants' ownership of the Benson Upgrader and patent rights thereto does not assure the defendants of receiving or acquiring in any manner a percentage of virtually all marketable commercial uranium ore produced by an up-grading process.

(e) That only three Benson Upgraders have been built to date, and they are identical in all major respects and were all built by Ross Benson; that two of these Benson Upgraders were put into operation many months prior to the defendants' purchase from Ross Benson of the third Benson Upgrader and such patents thereto that Ross Benson might obtain; that the first Benson Upgrader built was put into operation in the summer of 1956 by Mio Dio Uranium Company near Notum, Utah, and the second Benson Upgrader built was put into operation by Shawano Development Corporation near Baggs, Wyoming, in the early fall of 1956; that Ross Benson supervised the installation of the Benson Upgraders for Mio Dio Uranium Company and for Shawano Development Corporation; that several months ago Mio Dio Uranium Company turned over the operation of its mining properties and its Benson Upgrader to A. B. & H. Mining Company, which has discontinued operations; that efforts to up-grade low-grade uranium-bearing deposits to marketable commercial uranium ore, with the Benson Upgrader, by Mio Dio Uranium Company and by its operating successor A. B. & H. Mining Company have met with very little success; that efforts to upgrade low-grade uranium-bearing deposits to marketable commercial uranium ore with the Benson Upgrader by Shawano Development Corporation have proven unprofitable; that Shawano Development Corporation has produced and made only two small shipments of uranium-bearing material up-graded with the Benson Upgrader, one of which shipments was made in the latter part of 1956 and the other in the spring of 1957; that Shawano Development Corporation discontinued all operations in the latter part of 1958 and filed a voluntary petition for corporate reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., in the early spring of 1959, in the United States District Court at Cheyenne, Wyoming.

(f) That Shawano Development Corporation, several months before it discontinued operations, installed a small pilot plant in the same structure housing its Benson Upgrader, to determine the feasibility of an experimental leaching process, developed by its engineers, in making yellow cake from the uranium ore on its properties; that with this experimental leaching equipment Shawano Development Corporation made a total of approximately 900 pounds of yellow cake and only made use of a part of the Benson Upgrader in mixing certain acids and reagents with the uranium ore; that as a result of this experimental leaching process the engineers of Shawano Development Corporation prepared plans for a mill to make yellow cake, which plans did not include utilizing the Benson Upgrader in any manner whatsoever;

(g) That the only basis for the defendants' statements that the Benson Upgrader, with the addition of "component parts" costing about $100,000 would make yellow cake is the fact that Shawano Development Corporation made about 900 pounds of yellow cake with its experimental pilot plant leaching process

which was housed in the same structure containing the Benson Upgrader, and that only incidental use was made of a part of the Benson Upgrader in making such yellow cake, such incidental use of the Benson Upgrader being that of a mixing function, which could have been served as well by an ordinary cement mixer.

(h) That the defendants have tried to employ engineers of Shawano Development Corporation to build for them a mill that would make yellow cake, with the specific condition, however, that the Benson Upgrader be utilized somewhere in the yellow cake-making process so as to give some credence to the defendants' statements that the Benson Upgrader, with the addition of component parts, would make yellow cake, and that such engineers have informed the defendants that the Benson Upgrader has no value in a mill designed to make yellow cake.

(i) That there is no factual basis for the defendants' statements that only the Benson Upgrader can bring cheap nuclear energy to the entire United States or that the Benson Upgrader will replace the multi-million-dollar mills making yellow cake.

(j) That the defendants have no assured market for any up-graded uranium ore they might produce with the Benson Upgrader, nor do the defendants have an assured market for any yellow cake they might produce.

(k) That the buying policy of the Atomic Energy Commission is to discourage over-production of uranium ore and yellow cake.

(l) That the defendant John Milton Addison had not obtained insurance policies on his life, naming as beneficiaries therein the persons who have lent him money for which he has issued or has made commitments to issue his personal notes, nor has the defendant John Milton Addison made application for any such insurance policies within the last year.

12. In offering for sale and selling the securities described in paragraph 1 hereof, and in the manner and during the period of time stated therein, the defendants stated to purchasers and prospective purchasers of such securities—with respect to their timber rights:

(1) That the defendants have rights to timber worth in excess of $1,000,000 annually on more than 20,000 acres of land situated in the Arapahoe National Forest northwest of Granby, in Grand County, State of Colorado, and can cut the timber therefrom and sell same;

When in fact the defendants omitted to state in connection with making the statements set forth in sub-paragraph (1) of paragraph 12—

(a) That the defendants only have title to unpatented mining claims on the aforesaid properties, which limits the use thereof.

(b) That the defendants do not have title to, or the right to cut and sell timber from, the aforesaid property and that they may only use such timber therefrom as is necessary to conduct their own mining operations thereon.

(c) That the defendants must spend in excess of $100,000 a year on the aforesaid unpatented mining claims to comply with the annual assessment work required by federal and state laws in order to retain such title as they may have to such unpatented mining claims.

(d) That the defendants would have to patent their approximately 1,192 mining claims, comprising approximately 20,000 acres, before they could have title to the timber thereon and be permitted to lawfully cut and sell the timber therefrom.

(e) That the defendants must make a valid mineral discovery on each of their approximately 1,192 unpatented mining claims and would have to spend approximately $596,000 in development work on said claims as conditions precedent to obtaining patents thereto that would enable them to lawfully cut and sell timber therefrom.

(f) That there is no assurance that patents to said unpatented mining claims will issue to defendants, the issuance of

which is a prerequisite to lawful cutting and selling of timber therefrom.

(g) That the timber rights to approximately seven sections, comprising approximately 4,480 acres of the aforesaid approximately 20,000 acres, were conveyed by the Forest Service of the United States Department of Agriculture, at a public timber sale held June 26, 1958, to Broderick Wood Products Company, Denver, Colorado, and that the defendants have no vested or prospective interest or right in or to the timber on said approximately seven sections, other than using such timber therefrom as may be necessary to conduct mining operations thereon.

13. The foregoing facts set forth in sub-paragraphs (a) to (l), inclusive, of paragraph 11, and in sub-paragraphs (a) to (g), inclusive, of paragraph 12, which the defendants omitted to state, are material and their statement is necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

14. The defendants, directly and indirectly, obtained money and property by means of the statements and omissions set forth in paragraphs 11 and 12 hereof.

15. In offering for sale and selling the securities described in paragraph 1 hereof and in the manner and during the period of time stated therein, the defendants engaged in transactions, practices and courses of business which operate as a fraud and deceit upon the purchasers (sometimes referred to herein as lenders), in that the defendants engaged in acts and practices set forth in paragraphs 11, 12, 13, and 14.

16. The defendants and persons acting in concert and participation with them will unless enjoined continue to engage in the acts and practices set forth above.

### Conclusions of Law

1. This Court has jurisdiction of the parties hereto and of the subject matter hereof.

2. The Securities Act of 1933, as stated in its enacting clause, is designed

"To provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes."

To accomplish these objectives, the Act broadly defines several terms so as to cover ingenious methods devised to obtain money from members of the public to finance ventures. For example, the term *"security"* as defined in Section 2(1) of the Securities Act of 1933, 15 U.S.C.A. § 77b(1), includes (in addition to stocks, bonds, and the more conventional and commonly known kinds of securities)

"Any note, * * * evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, * * * investment contract, * * *"

█ 3. The personal loan notes issued and delivered to the lenders are securities. The definition of the term "security" includes "any note." Llanos v. United States, 9 Cir., 1953, 206 F.2d 852, certiorari denied 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417; Securities and Exchange Commission v. Vanco, D.C.N.J. 1958, 166 F.Supp. 422, 423.

4. The personal loan notes issued and delivered to the lenders are also securities by reason of being evidences of indebtedness. The definition of the term "security" includes "any * * * evidence of indebtedness." Llanos v. United States, supra [206 F.2d 853]; United States v. Monjar, D.C.Del.1942, 47 F. Supp. 421, affirmed 3 Cir., 147 F.2d 916, certiorari denied 325 U.S. 859, 65 S.Ct. 1191, 89 L.Ed. 1979; Securities and Exchange Commission v. Bailey, D.C.Fla. 1941, 41 F.Supp. 647.

█ 5. The written agreements delivered to lenders to the effect that the defendants would cause contracts to be executed conveying to lenders a percentage interest in the income and profits derived from the defendants' mining properties and operations are securities by reason of being certificates of interest and participation in profit-sharing agree-

ments. The definition of the term "security" includes "Any * * * certificate of interest or participation in any profit-sharing agreement." United States v. Davis, D.C.Ill.1941, 40 F.Supp. 246; Securities and Exchange Commission v. Wickham, D.C.Minn.1935, 12 F. Supp. 245, 249.

6. The oral agreements the defendants made with the lenders and with their non-salaried workers to the effect that the lenders and non-salaried workers would participate and share in the millions of dollars of profits that would be made by the defendants from their mining and other operations are investment contracts, and, as such, are securities. Roe v. United States, 5 Cir., 1961, 287 F.2d 435; Securities and Exchange Commission v. W. J. Howey Co., 1946, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244; Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88; Blackwell v. Bentsen, 5 Cir., 1953, 203 F.2d 690, certiorari dismissed 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078.

7. The legislative history of the Securities Act of 1933 makes it clear that this statute cannot be circumvented by simply refraining from issuing a written instrument evidencing the security transaction. The statute applies regardless of whether such securities are represented by any document. House Report No. 1838, 73rd Congress, 2d Session, U. S. House of Representatives, Page 39; Loss, Securities Regulations, 301.

8. The terms "sale," "sell," "offer to sell," "offer for sale," and "offer" are also broadly defined to include ingenious methods employed to obtain money from members of the public to finance ventures. For example, Section 2(3) of the Securities Act of 1933, 15 U.S.C.A. § 77b(3) defines the terms "sale" and "sell" to include "every contract of sale or disposition of a security, or interest in a security, for value;" and the terms "offer to sell," "offer for sale," and "offer" are defined therein to include "every attempt or offer to dispose of * * *, a security or interest in a security, for value." The definition continues by stating—"Any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been offered and sold for value." This means, for example, that a package transaction which includes a sale of a horse for $100 and a gift of a security to the purchaser nevertheless constitutes an offer and sale of the security for value within the meaning of the Securities Act of 1933. The giving of the personal loan notes, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements and investment contracts whether as a gift out of gratitude for, or in consideration or exchange of, the personal loans of money or services of labor rendered, constitute sales of securities because either way it amounts to a disposition or giving of a security for value. Llanos v. United States, supra; Securities and Exchange Commission v. Vanco, supra; United States v. Riedel, 7 Cir., 1942, 126 F.2d 81.

9. The acts and practices of the defendants set forth in the Findings of Fact are in violation of Sections 5(a) (1), 5(a) (2), 5(c), 17(a) (2) and 17 (a) (3) of the Securities Act of 1933, 15 U.S.C.A. §§ 77e(a) (1), 77e(a) (2), 77e(c), 77q(a) (2) and 77q(a) (3).

10. The plaintiff is entitled to a final judgment permanently enjoining the defendants, their officers, agents, employees, attorneys, successors, and assigns, and persons acting in concert and participation with them, from engaging in the aforesaid acts and practices.

11. The evidence sustains the allegations in Count 4 of the amended complaint and establishes sufficient grounds for granting the relief requested therein, but the need no longer exists for appointment of a permanent receiver to take over the funds and assets of the defendants or to further enjoin the defendants from dissipating or disbursing their

funds and assets by reason of the fact that the defendant Addison has been adjudicated a bankrupt in this Court and he and the corporate defendants have been ordered to turn over their funds and assets to the Trustee of the bankrupt estate of Addison.