SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**INTERNATIONAL HERITAGE, INC., Stanley H. Van Etten, Claud W. Savage, Larry G. Smith, International Heritage, Incorporated, a Nevada corporation, Defendants.**

Civil Action No. 1:98–CV–803–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 22, 1998.

James Edgar Long, William P. Hicks, Securities & Exchange Commission, Atlanta, GA, Gerald A. Jeutter, Jr., Kilpatrick Stockton, Raleigh, NC, for Plaintiff.

Michael K. Wolensky, David Joel Gellen, Robert G. Brunton, Kutak Rock, Atlanta, GA, F. Daniel Bell, III, Wyrick Robbins, Yates & Ponton, Raleigh, NC, Paul Greenberg, Office of Paul Greenberg, Los Angeles, CA, Brent E. Wood, Wood & Francis, Raleigh, NC, for Defendants.

### ORDER

STORY, District Judge.

Pursuant to Sections 20(b) and 20(d) of the Securities Act and Sections 21(d) and 21(e) of the Exchange Act, the Securities and Exchange Commission brought this action for injunctive and other equitable relief, alleging various violations of the securities laws. On April 3, 1998, the Court entered an order granting the Commission's Motion for Preliminary Injunction. This case is presently before the Court on Defendant International Heritage's Application for an Order Approving the Modified Compensation and Marketing Plan. After conducting a hearing and reviewing the entire record, the Court enters the following Order.

### FINDINGS OF FACT

The modified plan is in many ways similar to the old plan. Under both plans, an individual could join IHI and sell products at retail price for a profit, purchase products for personal use or earn out products by applying commissions earned from sales toward the purchase of a product. Under the old plan, the earn-out option required execution of a Retail Business Agreement, or "RBA."[1] The modified plan does not include the RBA or other similar contract. However, each representative is required to purchase a $100 Career Kit.

With the execution of a RBA, the representative earned 200 points, or what the company referred to as "Retail Sales Business Volume" (RSBV). Although the modified plan does not include the RBA, compensation is still calculated according to accumulated RSVB. The modified plan contains a component referred to as the "Bilateral Compensation Plan." Under the modified bilateral compensation plan, each IHI non-consumable product carries a specified number of RSBV. Business centers are still used to track and record RSBV.[2]

As under the old plan, participants still have the option of opening one, three or seven business centers.[3] The incentive for multiple centers was and still is to sponsor more business organizations. Under the modified plan, when a representative selects 1, 3, or 7 business centers, he also selects 1, 3, or 7 bonus products to be delivered as commission upon the accumulation of a specified number of RSBV.[4] When a representative selects the number of business centers and corresponding bonus products, he is not obligated to purchase the product or products selected. However, if a bonus product

---

1. An RBA was always initially filled out as an earn-out. Regardless of the option chosen, all sales representatives were required to purchase a Retail Business Career Kit for $100 under the old plan. Under the earn-out option, a participant executed a RBA and paid $250 toward the purchase of a product. As stated in the IHI manual, the RBA had a cash value of $250.

2. In the old plan and the modified plan, a business center serves as a necessary component in the creation of a business organization; a business organization consists of a group of sales representatives. Under IHI's old program and modified program, the only way to become a sales representative is by sponsorship through another sales representative. No more than two sales representatives can be sponsored directly under one business center under the bilateral plan.

3. The cost of seven centers was $1850.

4. Each bonus product must have a minimum representative value of $200.

has been selected, the representative will receive the product instead of a commission check.[5]

The accumulation of RSBV is still the mechanism for calculating override commissions.[6] In order to earn override commissions under the old plan, a sales representative was required to certify his retail business center by accumulating a minimum of 200 RSBV.[7] The concept of certification and recertification is not a part of the modified plan.[8] However, under the modified bilateral compensation plan, a representative is required to select a bonus product each quarter to be earned out as commission. Commissions are still earned according to preset RSBV achievement levels. A representative receives RSBV credit when he purchases a product at its representative cost. Commissions may be earned on a weekly basis under the Bilateral Compensation Plan.

Under the modified plan, once a sales representative has accumulated a total of at least 1,000 RSBV on each side of his sales organization, the representative will receive a $250 product. This is referred to as a Level One commission. A representative is not required to achieve a Level One commission in a specified amount of time. For a Level Two commission of $250, a representative must have accumulated at total of 2000 RSBV on each side; for Level Three commission of $500, 3000 RSBV on each side. Once a representative receives a Level Three commission, his RSBV total is cleared.

Although there is no time limit in which a representative must earn the RSBV required to receive commissions, a representative is required to meet a quarterly retail sales requirement to be eligible to receive commissions. After a representative receives his first commission check, the representative must make twelve (12) IHI sales within the following 13 week period. Of the required twelve (12) IHI sales, six (6) must be to consumers not affiliated with IHI.

The modified plan contains the same or similar sales incentives as those found in the old plan. Under the modified plan, the first two times a representative receives a Level Three Commission, the representative is entitled to receive a "free" business center which can be used to replace a business center in the representative's business organization. As under the old plan, this free business center is referred to as a "Development Certificate." Also, after a Level Three commission is earned, a representative can earn a $750 Development Bonus if two representatives, one on each side of his organization, earns a Level Three Commission within a one week commission period. If a representative earns a Level One, Two and Three commission and a Development Bonus within a one-week commission period, the representative will receive a $750 commission referred to as a "Cycle Bonus."

In addition to the Bilateral Compensation Plan which is based on accumulation of RSBV, a representative can also receive compensation under the Flex–Level Compensation Plan. Under the Flex–Level Compen-

5. At various places in the written materials, it appears that the new representative will receive $250 or the new representative will be able to choose between $250 and the product as the first commission.

6. Override commissions are commissions on sales made by other sales representatives within a business organization.

7. Under the earn-out option with the old plan, initial certification was accomplished by payment of $250 toward the purchase of a product order. With the $250 payment and product order, 200 RSBV was credited to the business center and to each business center above it in the retail sales organization, regardless of whether the product was ever actually purchased or

"earned out." If the product was earned in its entirety, the product was delivered to the representative. Representatives did not have the option of receiving a commission check in lieu of the product ordered upon execution of the RBA.

8. Under the old and modified plans, a sales representative cannot earn override commissions unless RSBV is migrating upward. To facilitate the migration of RSBV under the old plan, IHI required representatives who had achieved the first level of earnings to recertify their business centers every 13 weeks. Recertification was accomplished by purchasing products or executing more RBA's. If a representative sponsored a new representative who certified a business center, each business center above the new representative received 200 RSBV.

sation Plan, each IHI consumable product carries a specified number of Personal Volume ("PV"). Business centers are used to track and record PV and/or RSBV simultaneously. As under the Bilateral Compensation Plan, a representative can earn retail profits by purchasing IHI products at wholesale and selling them at retail to consumers. The Flex–Level plan also provides the opportunity to earn override commissions; however, commissions are calculated on a monthly basis.

To earn override commissions under the Flex–Level plan, a representative must meet minimum PV requirements. PV requirements can be met through retail sales to retail customers or to "Preferred Customers." A "Preferred Customer" is a non-IHI representative who purchases IHI products on a monthly basis. PV requirements can also be met through personal purchases. Under the Flex–Level plan a representative is required to accumulate a minimum total of 100 PV within a calendar month in order to earn override commissions. After meeting the basic Flex–Level plan requirements, a representative may earn Personal Volume Rebate Commissions. A rebate commission is a percentage of the total PV sales made by one representative within a calendar month.[9]

The Flex–Level plan is structurally different from the Bilateral–Plan. With the Flex–Level plan, a representative can sponsor a new representative who is positioned directly beneath him. The first sponsored person is the first generation of a "Leg" in a retail sales organization.[10] There is no limit to the number of legs or generations a representative may have.

· In addition to the Person Volume Rebate Commissions, a representative can earn various "Level Bonuses" by satisfying minimum Personal Volume and "Group Volume" requirements. Group Volume ("GV") is the sum total of all PV in a retail sales organization. The head of a RSO can earn Level Bonuses for the sales of other representatives up to 5 levels down in each qualified leg of a RSO.[11] The type of level bonus received depends on the PV and GV accumulated within a calendar month. For example, if a representative earns a total PV of 100 during a calendar month, he may earn 5% of the PV accumulated two levels down. This is called the Bronze Pin Rank. If a representative has a total PV of 100 and total GV of 500 which also consists of two legs that have accumulated 100 PV, the representative is entitled to 5% of the PV three levels down and has attained the Silver Pin Rank [12] If a generation fails to meet the minimum PV requirements, PV will be compressed up to the next level for purposes of calculating commissions. Similarly, if no generation within a leg meets the minimum PV requirements, the volume will be compressed up to the first qualified representative for the purpose of calculating a Rebate Commission.

Another type of override commission under the Flex–Level plan is the "Builder's Bonus." A representative may earn a Builder's Bonus from the sales of representatives within a leg of a RSO at his rank or higher. A Builder's Bonus carries a maximum value of an additional 5% of the PV generated by the leg. A Silver Pin Rank is entitled to 2% of the PV generated by the leg; a Gold Pin Rank, 3%; a Diamond Pin Rank, 4%; and a

9. If a representative sells products which have a total PV of 100 to 249, the representative earns 5% of the total PV sales; a total PV of 250 to 399 results in 10% of the total PV sales; more than 400 total PV results in 15% of the total PV sales.

10. The second generation of a RSO is each person sponsored by a member of the first generation. The third generation is each person sponsored by those second generation representatives, and so on.

11. A Qualified leg is a leg which has a representative above who has accumulated 100 PV.

12. A Gold Pin Rank entitles a representative to 5% of the PV four levels down and requires 100 PV, 1,500 GV consisting of three Qualified Legs; a Diamond Pin Rank entitles a representative to 5% of the PV five levels down and requires 200 PV, 4,500 GV consisting of six Qualified Legs of which three must have attained the pin rank of gold. The highest rank, the Double Diamond Pin Rank, also entitles a representative to 5% of the PV five levels down but requires 200 PV, 13,500 GV consisting of 12 Qualified Legs of which three must have attained the pin rank of diamond.

Double Diamond Pin Rank, 5%.[13] A Double Diamond Pin Rank representative may also earn override commissions totaling one share of 1% of IHI's monthly Flex–Level volume.

The Trendsetter Pool is also an added component of the modified plan. With the Trendsetter Pool, Flex–Level compensation and Bilateral compensation are linked.[14] If a representative sponsors a new representative and the sponsored representative sells or purchases products carrying a value of 600 RSBV while meeting the PV requirements of the Flex–Level plan, the sponsored representative will earn one share of 3% of IHI's monthly Flex–Level volume.[15] A representative who achieves this goal is called a "Trendsetter." A representative who sponsors a Trendsetter will earn one share of the Trendsetter Pool for each sponsored Trendsetter if the sponsor meets the minimum Flex–Level PV requirements. A sponsored representative is eligible for the Trendsetter Pool only within the first 30 days that he is associated with IHI, and a Trendsetter Sponsor is limited by the same 30–day period.

To meet both PV and RSBV requirements a representative may purchase various special product packs. For $275, a representative can purchase a "Quick Start Pack" and receive a Retail Business Career Kit, Heritage Essentials Nutritional Kit, Tyra Demonstration Kit, IHI Business Services Pack and 200 RSBV. For $825, a representative can purchase a "Success Pack" which includes a Retail Business Career Kit, Heritage Essentials Nutritional Kit, Heritage Essentials Tyra Skin Care Kit, a black leather portfolio, IHI Business Services Pack, and 600 RSBV. For $1925, a representative can purchase a "Career Pack" which includes a Retail Business Career Kit, Heritage Essentials Nutritional Kit, Heritage Essentials Tyra Skin Care Kit, a black leather portfolio, a black leather briefbag, a Bouree Crystal Bowl and Vase, IHI Business Services Pack and 1600 RSBV. The special product packs carry no PV credit although the packs contain consumable products which would normally carry PV credit under the Flex–Level plan.

The accompanying marketing materials of the modified plan are similar to those found in the old plan. With more business centers, a representative can "increase his weekly earning potential" and "leverage his time." To get started in the program, a representative is encouraged to start with more than one business center and purchase a special product pack.

IHI requests that the Court accept its modified compensation as presented while the Commission requests that the Court reject the modified plan in its entirety.

## CONCLUSIONS OF LAW

Based on the Court's finding of past violations of securities laws warranting preliminary injunctive relief, the Court is authorized to monitor IHI's business activities until a trial on the merits. The Commission contends the Court should prohibit any payment or consideration in exchange for the right to receive override commissions or bonuses. However, an individual may agree to be compensated in the form of his choosing. The primary issue before the Court is whether the modified plan involves an investment contract.

■ An investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). In determining whether there is an investment contract, the Court should consider promotional materials, merchandising approaches, oral assurances and contractual agreements used by the promoter. *Aldrich v. McCulloch Properties Inc.*, 627 F.2d 1036, 1040 (10th Cir.1980). Although IHI has submitted such materials, the Court does not have evidence related to actual implementation of the modified plan.

---

**13.** Bronze representatives cannot earn a Builder's Bonus.

**14.** A representative can satisfy PV and RSVB requirements simultaneously by purchasing consumable products for personal use and selling non-consumables at retail.

**15.** The marketing materials value products carrying 600 RSVB at the retail price of $825.

■ The modified plan, as described in IHI materials, does not involve an investment of money. The Commission argues an investment of services is sufficient to trigger application of the federal securities laws and the case at bar is similar to *S.E.C. v. Addison*, 194 F.Supp. 709 (N.D.Tex.1961). But see *Peyton v. Morrow Electronics, Inc.*, 587 F.2d 413 (9th Cir.1978) (contract requiring only an investment of services and not an investment of money is not an investment contract under the federal securities statutes). In *Addison*, the court held an agreement whereby non-salaried workers would share in profits made from their employer's mining and other operations was an investment contract under the Securities Act of 1933. The court in *Addison* held the exchange of services for a share of profits constituted the sale of securities because it amounted to a disposition or giving of a security for value. Unlike the workers in *Addison*, an IHI representative is not entitled to a share of IHI's profits simply by joining IHI, purchasing IHI products or selling IHI products.

Application of the third element of the *Howey* test distinguishes the case at bar from *Addison*. *Howey* requires an expectation of profits to be derived solely from the efforts of the promoter or a third party. In *Addison*, the non-salaried mine workers expected a profit derived solely from their employer's efforts in various business ventures including upgrading unmarketable deposits into marketable commercial ore, manufacturing machines to perform tasks associated with upgrading deposits, leasing upgrading machines and collecting royalties. In this case and at this stage of the proceedings, it is not clear that IHI representatives have an expectation of profits to be derived from the entrepreneurial or managerial efforts of others. See *Villeneuve v. Advanced Business Concepts Corp.*, 730 F.2d 1403, 1404 (11th Cir.1984); see also *United States v. Herr*, 338 F.2d 607 (7th Cir.1964), cert. denied 382 U.S. 999, 86 S.Ct. 563, 15 L.Ed.2d 487 (where investors were offered distributorhip agree-

ments under which distributor would give money to the defendant corporation in exchange for merchandise which salesmen would sell on behalf of distributors, court held agreements were investment contracts in light of the fact that it was not the defendant's or the distributor's intention to resell merchandise thereby leading the distributor to believe that they could expect profits solely from the efforts of others). The IHI Representative Manual and marketing materials explain that profits are derived from the sale of IHI products and the development of a sales force within a retail organization. Even if the Court were to conclude that the receipt of a product in lieu of a cash commission is an investment of money, there is no evidence upon which this Court can conclude that such an investment carries with it an expectation of profits to be derived solely from the efforts of others.

## *ORDER*

The Court has concerns about several aspects of the modified plan. The optional special product packs are particularly troubling because the cost of each pack and the corresponding RSBV mirror the old plan's cost for certification.[16] Certification of business centers under the old plan was an integral part of the violations found by the Court which resulted in the preliminary injunction. IHI asserts that the product packages are merely alternative packages of products that representatives may choose to assist them in marketing the company's products. However, the Court is concerned that these packages will be presented to prospective representatives as required purchases to be made along with the selection of one, three or seven business centers. The Trendsetter Pool and Bonuses are also problematic because they promote the purchase and sale of special product packs by allowing a new representative to only earn Trendsetter status within the first 30 days with the company and setting the required RSBV for Trendsetter as the same amount of RSBV awarded for the

---

**16.** One business center—Quick Start Pack— $275—200 RSVB.

Three business centers—Success Pack—$825— 600 RSVB.

Seven business centers—Career Pack— $1925—1600 RSVB.

Success Pack. Thus, significant pressure may be placed on the new representative to purchase at least a Success Pack when he or she applies to join the company to assure qualification for Trendsetter within the first 30 days. The Court strongly encourages IHI to omit the packages from its plan. However, because the special product packages are not *per se* violations of the prohibitions in the preliminary injunction, the Court does not order that they be omitted from the modified plan. The Monitor is instructed to inquire of new representatives concerning the presentation of the special product packages to them. Any tie-in between the purchase of any special product packages and the obtaining of business centers would be a violation of the preliminary injunction.

Representations in the written materials are misleading concerning the initial commission which is earned by a representative. When a representative applies with IHI, he or she selects a product for each business center the representative obtains. When the new representative earns the first commission, the commission is the product that was previously selected. However, at various places in the written materials, it appears that the new representative will receive $250 or the new representative will be able to choose between $250 and the product as the first commission (E.g. Application for an Order Approving the Modified Compensation and Marketing Plan, Exhibit 1, pp. 16–17, No. 3, 5, 7). The materials should clearly state that the first commission will be a product and not cash.

The modified plan requires that each quarter there be at least twelve (12) retail sales, six (6) of which must be to consumers not affiliated with IHI. (IHI Representative Manual, pp. 18—19). The plan should clearly state that six sales must be to persons who have no affiliation with IHI either as officers, agents, directors, shareholders, employees, or sales representatives.

In the explanation of the Flex–Level plan, the manual states, "Rank status is permanent, however, if a representative does not meet the monthly requirements of PV, GV, and leg requirements for their actual rank, they will be compensated based on that month's qualifications." To suggest that rank is permanent is misleading. The plan suggests that a representative is able to earn commissions based on "rank;" however, the mere attaining of rank does not assure ongoing commissions. This should be clearly stated in the materials presented to prospective representatives.

Although the modified plan has its shortcomings, none of the concerns raised above is a basis for denying approval to proceed with the plan. However, IHI is cautioned that the critical determination of the legality of its operations will not be based on the written plan but on the actual practices of the company. In *Webster v. Omnitrition International, Inc.*, 79 F.3d 776 (9th Cir.1996), Ominitrition established policies similar to those of Amway which had been approved by the Federal Trade Commission. The district court granted summary judgment to Omnitrition, finding that Omnitrition's program was not a pyramid scheme. In reversing summary judgment, the Ninth Circuit Court of Appeals stated, "[T]here must be evidence that the program's safeguards are enforced and actually serve to deter inventory loading and encourage retail sales." *Webster*, 79 F.3d at 783. Therefore, the final determination of the legality of the plan will be based on the actual implementation of it. By permitting IHI to proceed with the plan, the Court is not making a final determination of the plan's legality. Further, the Court has not reviewed the plan for compliance with any state's laws. The Court simply finds that based upon the written proposal, IHI should be permitted to proceed with its operations under the close scrutiny of the Monitor. This Order is not intended to, nor should it be interpreted as, an endorsement of the plan or of the business of IHI. Any person who has an interest in associating with IHI should make an independent investigation and decision concerning the same and should not rely upon this Order as a finding or conclusion as to any matter except as specifically stated herein.

Based on the foregoing, it is hereby ORDERED that IHI is authorized to conduct

business consistent with the modified plan submitted to the Court and under the continued observation of the Monitor. The Monitor is directed to monitor the Defendants' level of compliance with this and the Court's previous orders. Any violations should be reported promptly to the Court and the parties. Defendants are reminded that their full cooperation with the Monitor is required.