Mary S. CROWELL et al.

v.

The PITTSBURGH & LAKE ERIE RAIL-
ROAD COMPANY et al.

Civ. A. No. 72–1408.

United States District Court,
E. D. Pennsylvania.

March 8, 1974.

---

Victor Wright, Fox, Rothschild, O'Brien & Franke, Philadelphia, Pa., for plaintiffs.

Frederick N. Egler, Egler, McGregor & Reinstadtler, Pittsburgh, Pa., for Pittsb. & Lake Erie RR.

Thomas B. Rutter, Philadelphia, Pa., for Perlman.

Gilbert J. Helwig, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Allyn, Balliet, Cameron, Carroll, Hodge, Neuenschwander, Rockwell and VanPelt.

Philip H. Strubing, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Kirby, Snyder, Jr., Snyder, III.

Robert W. Sayre, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Maxwell.

Lewis H. Van Dusen, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for Gorman.

## OPINION AND ORDER

GORBEY, District Judge.

On July 18, 1972, eleven minority shareholders of The Pittsburgh & Lake Erie Railroad Company (P&LE) filed a complaint which questioned two series of transactions between P&LE and the Penn Central Transportation Company (Penn Central), the holder of a majority of P&LE's stock. The transactions at issue are: first, the financing of rebuilt railroad cars, which were purchased by P&LE from Penn Central (car financing); and, second, a series of loans made by P&LE to Penn Central (loans). In the ten counts of the complaint, the P&LE directors are charged with violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq., (1934 Act)), the Securities Act of 1933 (15 U.S.C. § 77a et seq. (1933 Act)), and state corporate law. The defendants have filed a motion for summary judgment and/or dismissal. The essential thrust of this motion is to determine the propriety of the federal forum for the resolution of these claims. The defendants have advanced six arguments, each of which is directed at one or more of the ten causes of action in the complaint.

First, defendants argue that the first four causes of action, which assert jurisdiction under the 1934 Act, should be dismissed with prejudice because the challenged transactions do not involve a security as defined by that Act. The first cause of action which deals with the car financing, states:

"Having depleted the cash of P&LE for the benefit of Penn Central, the individual defendants caused P&LE to enter into a conditional sales agreement at the rate of interest far in excess of the rate concurrently charged Penn Central by P&LE on the unsecured loans, and far in excess of the rate then prevailing for railroad equipment trust certificates of like quality."

It is the defendants' position that the installment sales contract is not a security as defined in the 1934 Act, thus the court is without jurisdiction. Section 3(a)(10) of the 1934 Act (15 U.S.C. § 78c(a)(10)) defines a security as follows:

"The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in a profit sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or

subscription, transferrable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days grace, or any renewal thereof the maturity of which is likewise limited."

This definition does not appear to include the usual two-party conditional sales agreement in which one party delivers goods in exchange for the promise of the other to pay over a future period of time.

The transaction at issue, however, is slightly more complex. In addition to the buyer and seller, it involves a group of third parties whose sole function it is to provide the financing. The transaction also involves some individual nominal owners of the railroad cars and a bank which functions as an escrow agent. The ultimate effect of all the transactions was: (1) to transfer title to the railroad cars from Penn Central to P&LE; (2) to arrange for the payment of cash from the investors to the Penn Central; and (3) to provide for the investors to be repaid from the cash of the P&LE over an extended period of time. These objectives were accomplished by several documents, and a number of which form a part of the record for this motion for summary judgment. The documents include two conditional sales agreements (CSA) between the two sets of nominal owners and P&LE. The terms of these agreements provide, *inter alia*, that the nominal owners will transfer title to the railroad cars in exchange for the payment of a specified sum in twelve annual installments. Next, there are two assignments (assignments) in which the nominal owners assigned their right, title and interest in the CSA to the Bank in exchange for a nominal sum and other unspecified consideration. There is a third three-party agreement (agency agreement), executed by P&LE, Provident National Bank (the Bank) and the investors. In the agency agreement: the Bank agreed to deliver the cars to P&LE pursuant to the CSA; P&LE agreed to make payments, pursuant to the CSA, in twelve annual installments to the Bank; and the investors agreed to advance to the Bank, on two dates certain, the funds necessary to purchase the railroad cars. The Bank also agreed to issue a "certificate of interest" to each investor at the time of his payment and to disburse to the investor the principal and interest which it receives from P&LE. The certificates of interest (certificates) which were issued by the Bank as evidence of the investors' advances provide for the investors' repayment by reference to both the agency agreement and the CSA.

It is the plaintiffs' contention that these "certificates of interest" are a security within the meaning of the Act. In defining a security, the Act includes an "investment contract". The Supreme Court in dealing with the term "investment contract" in the 1933 Act noted:

"The term 'investment contract' is unidentified by the Securities Act or by the relevant legislative reports. But the term was common in many state 'blue sky' laws in existence prior to the adoption of the federal statute and, although the term was also undefined in the state laws, it has been broadly construed by state courts so as to afford the investing public a full measure of protection. Form was disregarded for substance and emphasis was placed upon economic reality. An investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.' [Cites omitted] This definition is

uniformly applied by state courts in a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or someone other than themselves."

SEC v. W. J. Howey Co., 328 U.S. 293 at 298, 66 S.Ct. 1100 at 1102, 90 L.Ed. 1244 (1946).

▬ In this case, the investors have provided financing for the purchase of the cars in return for which they expect profits which result from P&LE's efforts. The 1934 Act has previously been held to reach those who supply financing in the form of a participation in a loan agreement. Lehigh Valley Trust Co. v. Central National Bank of Jacksonville, 409 F.2d 989 (5th Cir. 1969).[1] In viewing conditional sales agreements such as this which involve third parties whose only function is to provide financing, we must not let form take the place of substance. The role of the financiers is a passive one, and their interest is only to obtain a return on their investment. Whether their interest is evidenced by a separate document such as a note or is made part of a single contract, should not be controlling. Whether the document, it should be considered a security. Accordingly, we hold that the certificate of interest issued by the Bank to the investors is a security within the meaning of the 1934 Act. We therefore must reject the defendants' argument that the transactions involved in the first cause of action do not involve a security as defined by the 1934 Act.

It is the defendants' position that the loans which are the subjects of causes of action 2 through 4 are not a security because the notes which were issued to evidence the obligation had a maturity date of six months, and the 1934 Act definition of a security excludes notes which have a maturity at the time of issuance of not exceeding nine months.

Beginning December 20, 1968, P&LE changed its practice of short-term cash management. Prior to that time, it had invested cash in short-term commercial paper. On December 20, 1968, it began to loan its excess cash to Penn Central. The loans made at this time were evidenced by a receipt executed by Penn Central. At the time the loans were made, they had no definite maturity and were considered to be demand obligations by the treasurer of both companies.[2] On May 26, 1969, the Comptroller of Penn Central indicated that the borrowings would not be repaid within one year and should be classified as long-term investment advances to affiliated companies.[3] Beginning September 15, 1969, notes with a maturity of six months or less were executed as evidence of this indebtedness. At no time since December 20, 1968, have any of these notes been repaid in cash. However, some $3,000,000 in notes were offset against P&LE's obligation to Penn Central for federal income taxes.

▬ It is the defendants' contention that since these notes have a maturity date of less than 9 months, they are excluded from the definition of a security contained in the 1934 Act, thereby depriving the court jurisdiction. Other courts have recognized that a note with a maturity of less than 9 months may, notwithstanding the definition contained in the 1934 Act, still be a security for

---

1. The only place in which the defendants address themselves to the question of whether the certificates of interest (as opposed to the CSA) are a security appears in footnote 14 of their memorandum. Their contention, however, is that neither the P&LE nor the plaintiffs were purchasers of the certificates of interest, and that these certificates are "entirely collateral" to the conditional sales agreement, which is the subject of the plaintiffs' complaint. This argument, however, impliedly recognizes that the certificates of interest are a security and its thrust is directed at whether or not the alleged fraud was committed in connection with the sale of these securities. That issue is dealt with later.

2. Deposition, John H. Shaffer, pp. 3–5, 12.

3. Attachment, P–7 to plaintiffs' brief.

the purposes of that Act. Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075 (7th Cir. 1972); Zeller v. Bogue Electric Manufacturing Corporation, 476 F. 2d 795 (2d Cir. 1973). Where the documents which evidence a transaction do not reflect the agreement of the parties, the court may look to the underlying agreement to determine whether the transaction is within the scope of the Act. SEC v. C. M. Joiner Leasing Co., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); SEC v. Addison, 194 F.Supp. 709 (N.D.Tex.1961). Here, the plaintiffs have charged that the Penn Central had no intention of repaying these notes within the times specified on their face.

■■ The Court of Appeals for the Second Circuit was confronted with a similar transaction in Zeller, *supra.* There, a minority shareholder of a subsidiary corporation brought a derivative action under § 10(b) of the 1934 Act to recover loans made by that subsidiary to its parent corporation. The loans were first made on open account and subsequently replaced by demand notes. In the case before us, the loans to Penn Central were originally evidenced by receipts executed by Penn Central and subsequently replaced by six-month notes. In reversing the district court's dismissal of that action, the court of appeals in Zeller stated:

"It does not follow, however, that every transaction within the introductory clause of § 10, which involves promissory notes, whether of less or more than nine months maturity, is within Rule 10b–5. The Act is for the protection of investors, and its provisions must be read accordingly. See Movielab, Inc. v. Berkey Photo, Inc., 452 F.2d 662 (2d Cir. 1971). But we see no reason to doubt that [the subsidiary] stood in the position of an investor, although perhaps an involuntary one, with respect to [the parent]. We thus hold that, if at the outset a transaction had taken the form of [the subsidiary's] buying [the parent's] demand note, Rule 10b–5 would apply."

The same potential for the maker to control the time of repayment is present in the case at issue. We agree with the court in Zeller that in such cases the transaction involves a security, even though the maturity date specified on the notes is less than 9 months. Accordingly, we hold that the definition of a security includes notes issued by a parent corporation to a subsidiary with a significant public ownership, which have a maturity of less than 9 months but where repayment in accordance with the stated terms is not intended.

■ The defendants' second argument is that the first four causes of action do not involve the sale or purchase of a security, thereby making jurisdiction under the 1934 Act improper. Since Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), a plaintiff must have either purchased or sold securities in order to have standing to sue under § 10(b) of the 1934 Act. While there has been some movement away from this position in other circuits,[4] the Third Cir-

---

4. Eason v. General Motors Acceptance Corporation, 490 F.2d 654 (7th Cir. 1973). In overruling the district court's dismissal of an action for recision of shareholders' guarantees brought under the anti-fraud provisions of the 1934 Act, where the shareholders had guaranteed repayment of loans assumed by the corporation when it exchanged its stock for assets, the court of appeals stated:
  "Instead of stating the issue in terms of standing . . . it is more useful to ask whether the plaintiffs were members of the class for whose special benefit Rule

10b–5 was adopted. . . . [T]he rule has been interpreted to encompass additional types of misconduct and to extend protection to a variety of persons not included within the traditional definition of either purchaser or seller. . . . The course of judicial decision, since . . . Birnbaum . . . has actually recognized that the class of protected persons is broader than merely purchasers and sellers. . . . The emphasis on the injured party's status as an investor indicates that the protection of

cuit continues to prolong Birnbaum's longevity. *See* Landy v. Federal Deposit Insurance Corporation, 486 F.2d 139 at 153–156 (3d Cir. 1973).

▮ It is the defendants' contention that the plaintiffs were neither sellers nor purchasers of the securities in the car financing transaction; the subject of the first cause of action. We note first that in paragraph 1(c) of the complaint the plaintiffs assert that they are bringing this action derivatively on behalf of P&LE.[5] As part of the car financing transaction, certificates were issued by the Bank to the investors. In viewing the transaction in its entirety, P&LE was the real issuer of the certificates. The certificates were issued by the Bank in order to permit P&LE to raise funds for the payment of the railroad cars. The certificates were to be redeemed by the Bank as P&LE provided it with funds to do so. The Bank was not obligated to redeem the certificates unless it received the funds from P&LE. Thus, P&LE has in effect issued the certificates which are the securities at issue. There can be no question that the issue of a security is a sale. Hooper v. Mountain States Securities Corporation, 282 F.2d 195 (5th Cir. 1960). The defendants' contention that there was no sale of a security must therefore be rejected. Since the payment of interest at an allegedly excessive rate was part of the transaction in which capital was raised by the issue of the certificates, the alleged fraud was "in connection with" the sale of a security.

The transaction at issue is essentially the same as Movielab, Inc. v. Berkey Photo, Inc., 452 F.2d 662 (2d Cir. 1971). In that case, plaintiff corporation exchanged two installment notes for certain assets of the defendant corporation. The defendants in that case argued, as here, that the court lacked subject matter of jurisdiction because the alleged fraud was not in connection with the purchase or sale of any security within the meaning of the 1934 Act. Noting that both corporations were publicly held, the Court of Appeals for the Second Circuit affirmed the district court's denial of dismissal. In the case *sub judice*, we are confronted with the same situation. P&LE (on behalf of which the plaintiffs have instituted this suit) has issued its securities in exchange for certain assets from Penn Central. Both P&LE and Penn Central have a number of public shareholders. Therefore, if there is any fraud in connection with the transaction, like Movielab, Inc., it comes within the anti-fraud provisions of the Securities Exchange Act of 1934.[6] Therefore, the first cause of action will not be dismissed.

▮ Similarly, it is the defendants' contention that there was no sale or purchase of a security involving the notes which are the subject of causes of action numbers 2 through 4. The defendants rely upon McClure v. First National

the rule extends to persons who, in their capacity as investors, suffer significant injury as a direct consequence of fraud in connection with a securities transaction, even though their participation in the transaction did not involve either the purchase or sale of a security."

5. Since the Court of Appeals in Landy, *supra* precluded the plaintiffs from bringing a derivative action in the absence of showing a demand upon the receiver, the primary obstacle to maintaining a suit under the 1934 Act which was present in Landy is absent here.

6. The defendants point to Lino v. City Investing Company, 487 F.2d 689 (3d Cir.

1973), in which the Court of Appeals for the Third Circuit reversed the district court's denial of a motion to dismiss an action by a franchisee against the franchisor, where jurisdiction was founded upon the anti-fraud provisions of the 1934 Act. In discussing the district court's reliance upon Movielab, Inc., the Court of Appeals for the Third Circuit observed that: "We are not faced with a situation such as confronted the Movielab court and, in any event we are not bound by that decision." at 695–696. Here we are not confronted with an individual who has signed a promissory note as in Lino, but rather like Movielab, Inc., a note of a corporation with significant public ownership.

Bank of Lubbock, Texas, 352 F.Supp. 454 (N.D.Tex.1973), in which, after concluding that a note issued by a corporation to a bank and the subsequent note issued by a director to the corporation were not securities, went on to discuss why the issuance of such notes was not a "purchase or sale". In so doing, that court concluded that the note issued by the director to the corporation was not a purchase, since a purchase required that the transaction be "analogous to an investment or a stock transaction".[7] If the definition of a purchase includes such a requirement, it has been met here. P&LE, in advancing the funds to Penn Central, was putting its short-term cash out in anticipation of a return. As such, it was a corporate investor. *See* Superintendent of Insurance of the State of New York v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S. Ct. 165, 30 L.Ed.2d 128 (1971).

As stated earlier, the Court of Appeals in the Second Circuit was recently presented with an essentially, identical factual situation in Zeller, *supra.* Since the court in Zeller would not permit dismissal for a failure to state a claim under § 10(b) of the 1934 Act, we will not dismiss a claim based on the loans before us.

Accordingly, we hold that the loans in question involve the purchase of a security within the anti-fraud provisions of the 1934 Act.

Next, defendants argue that the fifth and sixth causes of action should be dismissed because § 17 of the 1933 Act (15 U.S.C. § 77q), upon which plaintiffs assert jurisdiction, does not give rise to a private cause of action. Issues such as this will continue to plague courts as long as the present patchwork of securities statutes is the basis for regulation of the nation's capital markets. It is the necessity of dealing with such issues, which cannot be resolved satisfactorily, that reflects the need for prompt enactment of the proposed federal securities code. *See* Louis Loss & George A. Blackstone, Codification of the Federal Securities Laws, 28 The Business Lawyer 381 (Jan.1973).

In several cases where the precise issue of a private right of action under § 17 was not before the court, courts have gratuitously pointed out that at the time of enactment of the 1933 Act, several of the leading commentators did not believe Congress intended § 17 to provide a private right of action.[8] Courts which have squarely faced the issue have held that § 17 does provide a private right of action. Dack v. Shanman, 227 F.Supp. 26 (S.D.N.Y. 1964); Larson v. Tony's Investments Inc., (M.D.Ala.1968) CCH ¶ 92,324 67–69 transfer binder; Dorfman v. First Boston Corporation, 336 F.Supp. 1089 (E.D.Pa.1972), *accord* Katz v. Amos Treat & Co., 411 F.2d 1046 (2d Cir. 1969); Osborne v. Mallory, 86 F.Supp. 869 (S.D.N.Y.1949); Thiele v. Shields, 131 F.Supp. 416 (S.D.N.Y.1955); Pfeffer v. Cressaty, 223 F.Supp. 756 (S.D. N.Y.1963). Of the cases referred to us by the defendants, only in Greater Iowa Corporation v. McLendon, 378 F.2d 783 (8th Cir. 1967) was a claim under § 17 of the 1933 Act dismissed. While the previously cited cases implied a private

---

7. Also it is significant to note that McClure involved a closed corporation with only two shareholders, one of whom became a shareholder as a result of a property settlement pursuant to a divorce from the defendant. Thus, the interest which the 1934 Act seeks to protect (*i. e.,* protection of public investors by maintaining the integrity securities markets) was not involved in McClure to the extent which it is here.

8. *See* SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (an action by the Commission under the 1934 Act) concurring opinion Friendly, J., at 867; Globus v. Law Research Service, Inc., 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S. Ct. 913, 25 L.Ed.2d 93 (1970) (an action under both § 17 of the 1933 Act and § 10(b) of the 1934 Act, in which the court denied punitive damages under § 17 of the 1933 Act; and Trussell v. United Underwriters, Ltd., 228 F.Supp. 757 (D.C.Colo.1964) (an action under the 1934 Act).

right of action from a reading of § 17 together with § 22(a) of the 1933 Act[9] (*i. e.*, statutory implication) the theory in Greater Iowa was that of a "statutory tort" under § 286 of the Restatement, Second, Torts. There, the court decided that since Greater Iowa Corporation was not a purchaser of the trust shares at issue, it was not within "the class that the statute was designed to protect".[10] Therefore, the complaint in Greater Iowa was not dismissed because § 17 fails to provide the right to a civil action; rather it was dismissed because the transaction did not involve a purchase. See discussion, *infra*. Accordingly, we conclude that § 17 gives rise to a private cause of action.

▮ Next, the defendants argue that the fifth and sixth causes of action should be dismissed because there was no purchase. Section 17 of the 1933 Act deals with fraud on behalf of the seller, thereby providing a remedy for the buyer. That section states in part:

"(a) It shall be unlawful for any person in the *offer or sale of any securities* by use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ a device, scheme, or artifice to defraud, . . ."

[Emphasis added]

It reaches only the fraudulent conduct of sellers, not the fraudulent conduct of buyers. This failure was recognized and was the reason for promulgation of Rule 10b–5 under § 10(b) of the 1934 Act. That rule makes it unlawful to employ any device, scheme or artifice to defraud "in connection with the purchase or sale of any security".[11] By including "purchase" in Rule 10b–5, the fraudulent conduct of buyers was also included

within its reach. Therefore, a civil action against a buyer must be maintained under the 1934 Act, and may not be maintained under § 17 of the 1933 Act.

▮ The fifth cause of action involves the car financing. In that transaction, P&LE (on behalf of which this derivative action is being maintained), through the Bank, was the issuer of the certificates of indebtedness. As an issuer, it is the seller of the securities. Since § 17 makes unlawful fraudulent conduct of the seller, it grants relief only to purchasers. Since P&LE is not a purchaser, an action under § 17 is improper. *See* Greater Iowa Corp., *supra*. Therefore, count 5 will be dismissed.

▮ The sixth cause of action involves the loan transactions. Defendants contend that the sixth cause of action must be dismissed "because there was no purchase". The thrust of the argument in their brief, however, is that there was an absence of "privity" between the plaintiffs and defendants in the loan transaction.[12] There is no question that the issue of the notes by Penn Central in exchange for P&LE's cash constituted a sale of the notes, nor can there be any question that P&LE, which is a nominal plaintiff in this derivative suit, was the purchaser of these securities. At issue, therefore, is whether the officers and directors are properly named as defendants since it was Penn Central and not the defendants who sold the securities at issue. Section 17 reads in relevant part, as follows:

"It shall be unlawful for any person in the offer or sale of any securities . . . [by a means of interstate commerce] . . . (3) to engage in any . . . course of business which operates . . . as a fraud or deceit upon the purchaser."

9. Osbourne, 86 F.Supp. at 878.

10. Restatement, Second, Torts, 1965 § 286(a).

11. 1 A. Bromberg, Securities Law: Fraud, § 2.2(410)–(420).

12. We note that within the Third Circuit at least one court has determined that a similar privity requirement which had been read into the 1934 Act is no longer required. Tully v. Mott Supermarkets, Inc., 337 F. Supp. 834 (D.N.J.1972).

Thus, the relevant inquiry is whether in the sale of the notes by Penn Central the named defendants engaged in any course of business which operated as a fraud or deceit upon P&LE. The present state of the record contains nothing from which it is possible to determine the participation or lack of participation of the named defendants in that transaction. Therefore, summary judgment at this time would be inappropriate.

The defendants' final contention is that the seventh through the tenth causes of action should be dismissed for lack of jurisdiction. Since these claims are founded in state law, their dismissal would be necessitated by dismissal of the underlying federal claims. Since jurisdiction for the underlying claims is properly vested in this court, the interests of judicial economy are better served by including the state claim within the pendent jurisdiction of this court. Therefore, defendants' motion to dismiss causes of action 7 through 10 will be denied.