## In re GAP STORES SECURITIES LITIGATION.

### No. MDL 277 SW.

United States District Court,
N. D. California.

Aug. 30, 1978.

Charles A. O'Brien, San Francisco, Cal., for plaintiff's liaison.

Jeffrey J. Parish, San Francisco, Cal., for plaintiff's committee.

Charles A. Legge, San Francisco, Cal., for defendant's liaison.

Theodore A. Kolb, Robert H. Fabian, Robert E. Graham, Sullivan, Roche & Johnson, San Francisco, Cal., for defendant's committee.

## MEMORANDUM OF OPINION AND ORDER

SPENCER WILLIAMS, District Judge.

The thirteen cases involved in this multidistrict securities litigation are before the court on a motion for summary judgment brought by defendant George E. Powell, formerly Vice-President-Distribution of the Gap Stores, Inc. After careful consideration of the briefs and arguments of counsel and the evidence submitted in connection therewith, the court finds that, viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to plaintiffs, the defendant is clearly entitled to prevail as a matter of law.

## FACTUAL BACKGROUND

The undisputed facts before the court relevant to this motion demonstrate that George Powell was a lesser member of the Gap management who played, at best, a negligible role in the company's preparation for its public offering. Powell was employed as Vice-President-Distribution for the Gap Stores, Inc. from November 1974 through November 1976, in which capacity he was primarily responsible for the operation of the company's warehouse distribution centers. He was also responsible for the security of the physical inventory and the shipment of goods to and from the Gap stores. However, he was not responsible for the purchase or pricing of inventory or the control of inventory levels.

As a corporate officer, Powell belonged to an Executive Committee that met regularly to keep operational officers apprised of developments in other departments and to make strategic plans for the future of the company. Despite its impressive name, the Executive Committee did not participate in the preparation of the Registration Statement or Prospectus according to the unrefuted affidavit of James D. Abrams, the principal Gap officer responsible for the collection of information for those documents. Unlike certain Gap officers, Powell was not a Director and never attended a Director's meeting; neither was he a shareholder at the time of the public offering, although he did hold options to purchase 2,200 shares at $2.50 per share. Those options were exercised in January of 1977, several months after he had severed his

relationship with the company. A few weeks prior to the Gap's public offering Powell tendered his written resignation due to a personality conflict with the president.

Generally speaking, plaintiffs' theory in this litigation is that the defendants' misrepresented the nature and value of the Gap inventory, thereby materially misrepresenting the Gap's earnings. More specifically, they contend, the Prospectus misrepresented the Gap's merchandising and computerized inventory systems. The narrative portion of the Prospectus containing these alleged misrepresentations is entitled "Merchandise Replenishment and Distribution." If George Powell is to have any liability in this action it must be because he is, in some manner, responsible for the contents of this section.[1]

The first two paragraphs of the section, describing the Gap's merchandise replenishment system, read as follows:

> Through its merchandise replenishment system the Company maintains each store's and each distribution center's inventory by units and in quantities which reflect the volume and speed of anticipated sales. These desired inventory levels are maintained through a computerized inventory system which ensures that an article sold on Saturday can be replaced in the store by the following Friday. By use of such a system, buyers are able to place basic re-orders· weekly to replenish items sold. Each buyer receives detailed sales and inventory reports by item, by store and on a Company-wide basis, which permit the buyer to maintain constant awareness of market trends ascertained from Company sales and each store's changing needs. The buyers are also kept informed through six regional merchandise coordinators.

> It is the Company's policy to avoid carrying replenishment inventory in its stores. Such inventory is maintained in the Company's distribution centers, thereby avoiding excessive stock in the wrong place and reducing markdowns. Shipments are made from Company distribution centers to each store at least twice a week, and frequently more often. Inventory in each of its stores remains relatively constant throughout the year, except during back-to-school and holiday selling seasons when it is increased.

1. Late in the briefing on this motion plaintiffs discovered George Powell was involved in litigation regarding his personal bankruptcy and the bankruptcy of his former corporation Omega Business Services, Inc., whereupon they asserted the Prospectus biography of Mr. Powell contained material misrepresentations because it failed to reveal "he was a defendant in a securities fraud action." Mr. Powell's biography reads as follows:

   > Mr. Powell joined the Company in August, 1974, as National Distribution Manager, and since November, 1974, has been Vice President of Distribution. From 1967 to 1972 he was National Distribution Manager of Levi Strauss & Co. and from 1973 to 1974 was Chief Executive Officer and sole shareholder of Omega Business Services, Inc., a management consulting firm, which filed a petition under the Bankruptcy Act in October, 1974. Shortly thereafter, Mr. Powell also filed a petition under the Bankruptcy Act.

   Powell's involvement with this biography was far more substantial than his involvement with any other portion of the Prospectus. In his deposition he admitted having reviewed an earlier draft(s) and having discussed its contents with Donald Fisher and Andre de Baubigny because he was embarrassed by the public disclosure of his bankruptcy and other litigation. While it is not entirely clear whether he was responsible for writing any part of the final version, it is clear that he actively "negotiated" its contents, with the purpose of minimizing the disclosure of his personal affairs.

   Despite Powell's active participation in the drafting of his biography, the court is persuaded he is entitled to summary judgment. Initially it must be noted that this claim regarding his biography bears no apparent relation to the allegations of the complaint or the theory of these actions. Secondly, from the papers submitted to the court it is evident the litigation involved the dischargeability of a debt in bankruptcy and the alleged fraud involved transfer of certain real property in violation of a security agreement, not "securities fraud." The information regarding Powell's bankruptcy was provided as required by Registration Statement Form S–1. That form, however, does not require the disclosure of all pending civil actions in which the officer is a defendant, as well as an exposition of all the plaintiffs' theories of liability. In view of the fact no final judgment had been rendered, the court cannot see how the failure to disclose the litigation constituted actionable misrepresentation.

The third paragraph relates more specifically to George Powell's area of responsibility. It reads as follows:

Prior to January 15, 1976, all merchandise was distributed from two Company distribution centers in the San Francisco area, often by air to stores outside California. A new distribution center of approximately 100,000 square feet was opened in Florence, Kentucky on January 15, 1976, to serve all stores east of Chicago. It is believed that this will provide savings in freight charges and faster replenishment of those stores. It has resulted in the closing of one of the San Francisco distribution centers.

Before his deposition had been taken, Powell executed an affidavit in support of this motion which averred that he "was asked to review the narrative entitled 'Merchandise Replenishment and Distribution' . . . *as it related to [his] narrow area of responsibility*," (emphasis added), but he "did not make any statements or representations which were included in the prospectus." Several persons who were instrumental in the preparation of the Gap Registration Statement and Prospectus also executed affidavits regarding Powell's participation in the same. Responsible personnel of both the managing underwriters swore that the underwriters never had any communications with Powell regarding the Registration Statement or Prospectus. Mr. James D. Abrams, Vice-President Corporate Affairs and Treasurer of the Gap, who was mentioned above as the principal officer responsible for the collection of information for the two documents, likewise swore that to his knowledge Powell was not requested to and did not participate in the preparation of either document. Furthermore, Abrams stated that he was unaware Powell was asked to review this section of the Prospectus and that no changes were made as a result of any such review.

At his subsequent deposition, Powell explained that Abrams had once asked him to write up something on the Distribution system. He did not recall whether he knew what it was for at the time, but he later recognized the last paragraph of the section entitled "Merchandise Replenishment and Distribution" to be a condensed version of the one-half page description he had written at Abrams' request. With regard to his review of the narrative, he could not recall whether he saw the entire section or only the last paragraph. Other than his biographical blurb, Powell never discussed any part of the Prospectus with any member of the Gap management. The admissions contained in Powell's affidavit and deposition are the only evidence to connect him with the Prospectus or Registration Statement in any way.

Plaintiffs have opposed this motion primarily with a flurry of inter-office memos and reports, either directed to Powell's attention or written by him, that generally relate to inventory and distribution problems the Gap experienced during the Spring of 1976. These documents raise a triable issue of fact regarding the representations made in the first two paragraphs of the narrative entitled "Merchandise Replenishment and Distribution" because they suggest the system, at least in the Spring of 1976, did not operate as described in the Prospectus. For purposes of this motion, therefore, the court must assume that the first two paragraphs contained material misrepresentations. The court must also assume that if Mr. Powell read and reviewed these paragraphs in the Spring of 1976 he must have known they were deceptive.

■ The memos and reports, however, do not raise a triable issue of fact regarding any of the representations made in the last paragraph of the narrative. It is undisputed that prior to January 15, 1976 the Gap had two San Francisco distribution centers servicing all of the stores, and thereafter a distribution center was opened in Florence, Kentucky to serve stores east of Chicago. Plaintiffs have urged, however, that Powell's deposition statement that the distribution area was "in a state of continual crisis" demonstrates it was not "believed that [the opening of an eastern distribution center] provide . . . faster replenishment of

those stores." Disregarding for the moment whether this statement of belief is a material misrepresentation upon which a reasonable investor would rely, *see Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489 (9th Cir. 1974), the court still is not persuaded that any part of Powell's extended deposition testimony regarding problems in the distribution area in the Spring of 1976 intimates that Gap management did not believe an east coast distribution center could service east coast stores more rapidly than a west coast center. Furthermore, no evidence has been submitted to show this "prediction" did not come true.

From the foregoing discussion of the evidence it is apparent Powell's only involvement with the Prospectus narrative entitled "Merchandise Replenishment and Distribution" was that: (1) he wrote a preliminary draft of the third paragraph which he may or may not have known was intended to be included in the Prospectus; (2) he reviewed the third paragraph for accuracy; and (3) he may or may not have reviewed the first two paragraphs for accuracy. The evidence further reveals that the person primarily responsible for gathering information for the Prospectus was not aware of Powell's participation, and, therefore, did not rely upon his review of the narrative to guaranty its accuracy.

DIRECT PARTICIPATION

Plaintiffs' uniformly stated complaint charges each defendant with every one of the alleged securities violations. In their opposition to this motion, however, plaintiffs have naturally retreated from the theory that Powell is liable as a direct participant and concentrated instead upon his role as aider or abettor. A review of the law confirms plaintiffs' tacit admission that Powell's limited participation is insufficient to establish liability as a direct participant.

The first count of the complaint alleges violations of § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j, and regulations 10b–5; 10b–6 and 10b–7, issued thereunder, 17 C.F.R. §§ 240.10b–5, 240.10b–6, 240.10b–7. Regulations 10b–6 and 10b–7 have no apparent application to Powell since he was neither an underwriter, issuer, broker, dealer, nor other participant in a distribution of stabilization of a security. Because of his limited involvement in the writing and review of the Prospectus, however, Powell is subject to suit under § 10(b) and Rule 10b–5.

Rule 10b–5 states, "It shall be unlawful for any person, directly or indirectly, . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." The only representations directly attributable to Powell are those contained in the third paragraph of the narrative which the court has already determined did not misrepresent the truth. Under the broadest possible interpretation of the disputed facts, however, Powell may have read and reviewed the first two paragraphs of the narrative knowing the same to materially misrepresent the truth and done nothing to see that the Prospectus was corrected.

In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) the United States Supreme Court squarely held that allegations of negligence are insufficient to state a claim under § 10(b) and Rule 10b–5. While using the traditional language of scienter, the Court left open the question of whether allegations of recklessness would state a claim, 425 U.S. at 194 n.12, 96 S.Ct. 1375. Since *Hochfelder,* the Ninth Circuit has held that knowing or reckless conduct is included within the ambit of § 10(b) and Rule 10b–5. *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir. 1978).

Whether or not Powell's conduct can be said to have been "knowing or reckless" depends on the duty he owed to prospective purchasers of Gap stock. Prior to *Hochfelder,* the Ninth Circuit adopted a flexible duty standard to meet the varied factual contexts which arise in modern securities transactions. *White v. Abrams,* 495 F.2d 724, 734 (1974). Because that flexible duty

standard permitted liability in certain circumstances based upon negligence alone, its precedential value is in question after *Hochfelder. Compare Crocker-Citizens National Bank v. Control Metals Corp.*, 566 F.2d 631, 636 n.2 (9th Cir. 1977) ("Absent the possibility of liability based upon negligence, *Hochfelder* is not inconsistent, on its facts, with the flexible duty standard established in *White v. Abrams.*"); *with Robinson v. Heilman,* 563 F.2d 1304, 1308 (9th Cir. 1977) ("[T]he closer the relationship of the person charged to the corporation and the greater his participation in the transactions attacked, the easier it will be to prove the requisite *scienter.* That state of affairs, however, provides no justification for any inference that direct participants have any greater or different duty to buyers or sellers of securities than those whose connections with the transaction may be more remote."). Until the Ninth Circuit explicitly re-examines *White v. Abrams,* however, it should be followed to the extent it is not directly inconsistent with *Hochfelder.*

*Abrams'* flexible duty standard sets forth the following factors for assessing the defendant's conduct: (1) the relationship of the defendant to the plaintiff; (2) the defendant's access to the information as compared to the plaintiff's access; (3) the benefit that the defendant derives from the relationship; (4) the defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decisions; and (5) the defendant's activity in initiating the securities transaction in question. 495 F.2d at 735. Measuring Powell's conduct against this standard it is apparent he breached no duty to prospective shareholders when he failed to initiate a rewriting of the first two paragraphs of the Prospectus narrative entitled "Merchandise Replenishment and Distribution."

The Gap public offering involved hundreds of thousands of impersonal transactions occurring nationwide during a limited period of time. Because Powell was not among the selling shareholders, his only possible relationship with prospective purchasers arose from his position as an officer of the issuer. He did not sign the Registration statement or Prospectus, and there was no ostensible reason for the public to place particular reliance upon him for the veracity of the Prospectus. Although he possessed "inside" information, he did not benefit from it because he did not deal. Liability cannot rest on this weak footing, for as the Ninth Circuit observed in *Abrams,* "where the defendant's relationship with the plaintiff is so casual that a reasonably prudent person would not rely upon it in making investment decisions, the defendant's only duty is not to misrepresent intentionally material facts." 495 F.2d at 736.

This conclusion is reached with some reservation for it is true that full disclosure in the marketplace would be better served by a rule requiring every corporate employee to expose misleading statements in the corporation's public pronouncements. Perhaps, even the secretary who types a misleading prospectus, knowing the same to be false, should be held accountable. In this court's view, however, § 10(b) and Rule 10b–5 do not affix such automatic liability on corporate employees. Officers are correctly held to a higher standard of conduct than lesser employees, when trading in the company's securities, 15 U.S.C. § 78p, but even then courts are directed to look behind the title to determine whether some significant access to inside information actually accompanied the position. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Livingston,* 566 F.2d 1119, 1121–22 (9th Cir. 1978). Unlike directors, officers do not necessarily possess any particular authority or responsibility. *See Rosenbloom v. Adams, Scott & Conway, Inc.,* 552 F.2d 1336, 1339 (9th Cir. 1977). The modern-day proliferation of vice-presidents is proof itself that titles may have more to do with ego than with authority. George Powell was an officer in name, but he did not exercise any of those traditional functions that might create a duty in him vis a vis the investing public. He was not a spokesman for the company, and he did not control corporate policy, keep the corporate books, or hold the corporate seal. Therefore, because he owed no duty to plaintiffs,

1142

other than to refrain from making material misrepresentations, he cannot be directly liable under the first count of the complaint.

The second count of the complaint alleges a violation of § 17 of the 1933 Securities Act, 15 U.S.C. § 77q. Defendants have moved for summary judgment on this count asserting there is no private right of action under § 17, and citing in support of their position *Architectural League of New York v. Bartos*, 404 F.Supp. 304, 313 (S.D.N.Y. 1975) and *Dyer v. Eastern Trust and Banking Corp.*, 336 F.Supp. 890, 903–05 (D.Me. 1971). Arguing there is a private right of action under § 17, plaintiffs have cited a long list of cases where such a cause of action was recognized in dictum or otherwise. *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir. 1975); *Schaefer v. First National Bank of Lincolnwood*, 509 F.2d 1287, 1293 (7th Cir. 1975); *deHass v. Empire Petroleum Co.*, 435 F.2d 1223 (10th Cir. 1970); *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1056 n.10 (2nd Cir. 1969); *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 143–44 (7th Cir.) *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969); *Fischman v. Ratheon Mfg. Co.*, 188 F.2d 783, 787 n.2 (2nd Cir. 1951); *B & B Investment Club v. Kleinert's, Inc.*, 391 F.Supp. 720, 726 (E.D.Pa.1975); *Crowell v. Pittsburgh & Lake Erie Railroad Co.*, 373 F.Supp. 1303, 1310–11 (E.D.Pa.1972); *Dorfman v. First Boston Corp.*, 336 F.Supp. 1089, 1093–96 (E.D.Pa.1972); *Johns Hopkins University v. Hutton*, 326 F.Supp. 250, 252 (D.Mo.1971); *Larson v. Tony's Investments, Inc.*, 46 F.R.D. 612, 614 (M.D.Ala. 1969); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 422 (N.D.Cal.1968), *modified on other grounds*, 430 F.2d 1202 (9th Cir. 1970); *Dack v. Shanman*, 227 F.Supp. 26, 28–29 (S.D.N.Y.1964).

Among these cases, the most thoughtful discussion of the problem is found in *Dorfman v. First Boston Corp.*, 336 F.Supp. 1089, 1093–96 (E.D.Pa.1972). Attempting to harmonize an implied private right of action under § 17 with the express limitations on liability found in §§ 11 and 12 of the 1933 Act, the *Dorfman* court concluded that a private right of action, not subject to the § 12 limitations, existed under § 17(a)(1) and (a)(3) where fraud was alleged and proved. However, a private right of action under § 17(a)(2), for negligent misrepresentations, was subject to the limitations found in § 12. This approach has added persuasiveness after *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), because of the Supreme Court's new found concern that individual sections of the '33 and '34 Acts be interpreted as part of a consistent scheme of regulation.

■ The Ninth Circuit has never directly addressed the issue of a private right of action under § 17 although it has intimated one might exist. *See, e. g., Bosse v. Crowell, Collier & MacMillan*, 565 F.2d 602, 610 n.12 (9th Cir. 1977); *White v. Abrams*, 495 F.2d 724, 727 n.2 (9th Cir. 1974). In the absence of clear guidance from the Ninth Circuit it is the determination of this court that a private right of action should be implied under § 17, but subject to the limitations imposed by the *Dorfman* court for the reasons stated therein.

■ George Powell's failure to correct the Prospectus is not culpable conduct within the coverage of § 17(a)(1) and (a)(3) for the same reason it is not actionable under § 10(b) and Rule 10b–5. Assuming for the moment that § 17(a)(1)'s proscription against employing "any device, scheme, or artifice to defraud" and § 17(a)(3)'s admonition against engaging "in any transaction, practice, or course of business which operates . . . as a fraud or deceit upon the purchaser" encompass material misrepresentations contained in a prospectus, it is still the case that Powell owed no duty to prospective purchasers to correct misrepresentations in the Prospectus made by others than himself. Neither does § 17(a)(2) state a claim against Powell because he did not "obtain money or property by means of any untrue statement of a material fact." For these reasons Powell cannot be found directly liable under the second count of the complaint.

The third and fourth counts of the complaint are dispensed with more easily than the first and second. Count three alleges a violation of § 11 of the Securities Act of 1933. Powell cannot be directly liable under that section because it is limited to persons who are signators of the registration statement, directors or partners of the issuer, experts named as preparing or certifying a portion of the registration statement, or underwriters with respect to the issue. Likewise, Powell cannot be directly liable under § 12(2), plead as the fourth count of the complaint, because that section by its express terms is limited to one who "offers or sells a security."

The pendent state claims provide no greater source of direct liability for Powell than do the federal claims. Count five alleges a violation of §§ 25401, 25501 and 25504 of the California Corporations Code. Disregarding for the moment § 25504, which governs the indirect liability of controlling persons and aiders or abettors, the other two sections have no application to Powell because they are limited to persons who sell (or offer to sell) or buy (or offer to buy) securities. Count six alleges a claim for common law deceit, which requires in California proof that the defendant made a false representation, with knowledge of its falsity, intending to induce reliance thereon, and that the plaintiff actually and reasonably relied on the representation thereby suffering actual damages. *Crocker-Citizens National Bank v. Control Metals Corp.*, 566 F.2d 631, 636 (9th Cir. 1977); *Vasquez v. Superior Court*, 4 Cal.3d 800, 811, 94 Cal.Rptr. 796, 484 P.2d 964 (1971); Cal.Civ.Code §§ 1709, 1710 (West 1973). Since Powell did not make any false representations he can not be directly liable for fraud. Finally, the seventh count of the complaint pleads common law negligence. For the reasons stated above, it has no application to Powell because he owed no duty to prospective purchasers to correct misrepresentations in the Prospectus made by other persons.

## INDIRECT PARTICIPATION

Painting with a broad brush, the complaint alleges each defendant was an aider or abettor and a controlling person within the coverage of § 15 of the 1933 Securities Act, 15 U.S.C. § 77o, and § 20(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78t. In his affidavit supporting this motion George Powell averred that while he was Vice-President-Distribution he was asked from time to time his impressions or opinions of general company policy, but he "was not able to and did not control decisions of the executive officers or the corporation." Plaintiffs have come forward with no evidence to refute this assertion. In fact, some of Powell's deposition testimony and other documentary evidence submitted by plaintiffs tends to suggest that Powell's problems in the distribution area in the Spring of 1976 were precisely a result of his inability to persuade Gap management of the need for certain changes in company policy. Since plaintiffs have not raised a triable issue of fact regarding the controlling person allegations, Powell is entitled to summary judgment dismissing them. *See also Strong v. France*, 474 F.2d 747, 752 (9th Cir. 1973) ("This circuit has held that the test of liability is that the controlling person * * * must have acted in bad faith and directly or indirectly induced the conduct constituting a violation or cause of action." (citations and quotation marks omitted).)

The aiding or abetting allegation, on the other hand, has been the primary focus of plaintiffs' opposition to this motion. The notion that aiding or abetting may constitute a violation of § 10(b) and Rule 10b–5 owes its origin to judicial construction, borrowing from the Restatement of Torts § 876 (1939) which provides in pertinent part: "For harm resulting to a third person from the tortious conduct of another, a person is liable if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, . . . ." *See generally* 2 Bromberg, Securities Law § 8.5 (514–549) (1975); Ruder, *Multiple Defendants in Se-*

*curities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution,* 120 U.Pa.L. Rev. 597 (1972) [hereinafter cited as Ruder]; Note, *Rule 10b–5 Liability After Hochfelder: Abandoning the Concept of Aiding and Abetting,* 45 U.Chi.L.Rev. 218 (1977) [hereinafter cited as *Abandoning Aiding and Abetting*]. Recent decisions, however, raise questions about the continued utility of aiding or abetting as a separate theory of liability.

The Seventh Circuit had held in *Hochfelder v. Ernst & Ernst,* 503 F.2d 1100, 1104 (7th Cir. 1974), that one who breaches a duty of inquiry and disclosure owed another is liable for *aiding and abetting* a third party's violation of Rule 10b–5 if the fraud would not have been discovered or prevented but for the breach. On appeal the Supreme Court declined to consider whether civil liability for aiding and abetting is appropriate under § 10(b) and Rule 10b–5, and what might be the elements necessary to establish such a cause of action. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 192 n.7, 96 S.Ct. 1375 (1976). By whatever theory a court proposes to impose liability, however, there is no doubt after *Hochfelder* that the court must first find the elements of knowledge and intent captured within the Supreme Court's definition of scienter. Applied to the traditional elements of a cause of action for aiding or abetting this most likely means the following facts must be proven: (1) the primary wrongdoer's independent violation of § 10(b) and Rule 10b–5; (2) the aider or abettor's performance of activities which substantially assisted the violation; (3) the aider or abettor's knowledge of the primary violator's wrongdoing; and (4) the aider or abettor's knowledge of his role in furtherance of the scheme. *See Abandoning Aiding and Abetting* at 240–42.

A special problem of interpretation arises in this circuit because of the *White v. Abrams* case previously discussed. *Abrams* purported to adopt a flexible duty standard to "avoid the confusion that arises from classifying the defendants as primary and secondary or from classifying the transactions as direct and indirect." 495 F.2d at 734. The quoted language suggests the cir-

cuit was expressly rejecting aiding or abetting as a separate theory of liability. *Abandoning Aiding and Abetting* at 250. There are two good reasons, however, to avoid the conclusion that allegations of aiding or abetting do not state a claim. The first is that, as previously mentioned, *Abrams'* precedential value is in question after *Hochfelder.* The second is that all of the *Abrams* factors focus upon the relationship between the plaintiff and the defendant, leading to the conjecture that the court did not intend to deal with situations where there is no relationship between the plaintiff and the defendant, but where the defendant, nonetheless materially and substantially contributes to the wrong done.

An additional interpretive problem is presented by the circuit's recent holding that recklessness will satisfy *Hochfelder*'s scienter requirement. *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir. 1978). If an allegation of recklessness will suffice in an aiding or abetting case it may not be, as suggested above, that the aider or abettor must have knowledge of the wrong done and of his role in furtherance of the scheme. All that may be required is that he acted in reckless disregard of the possibility his conduct was substantially assisting a fraud. Faced with this exact question, the Second Circuit recently held where the alleged aider or abettor *owes a fiduciary duty* to the defrauded party, recklessness will satisfy the scienter requirement. *Rolf v. Blyth, Eastman, Dillon & Co., Inc.,* 570 F.2d 38, 44 (2nd Cir. 1978).

Without considering whether allegations of aiding or abetting state a viable claim, defendants have supported this motion on the ground that silence and inaction do not constitute aiding or abetting a violation of § 10(b) and Rule 10b–5. The first major case to recognize civil liability for aiding or abetting held that allegations a corporation had failed to report improper activities of a brokerage firm to the state authorities or the SEC were sufficient to survive a motion to dismiss. *Brennan v. Midwestern United Life, Co.,* 259 F.Supp. 673, 682 (N.D.Ind.1966).

Certainly, not everyone who has knowledge of improper activities in the field of

securities transactions is required to report such activities. . . . Yet, *duties are often found to arise in the face of special relationships*, and there are circumstances under which a person or a corporation may give the requisite assistance or encouragement to a wrongdoer so as to constitute an aiding and abetting by merely failing to take action. 259 F.Supp. 673, 681–82 (emphasis added).

A judgment against the defendant was subsequently upheld by the Seventh Circuit, however, on the basis the defendant had been guilty of affirmative misconduct, thus leaving open the question of liability for silent acquiescence. *Brennan v. Midwestern United Life Insurance, Co.*, 417 F.2d 147, 151–54 (7th Cir. 1969).

A case from the Ninth Circuit, *Wessel v. Buhler*, 437 F.2d 279 (9th Cir. 1971), is frequently cited as taking a position directly contrary to the *Brennan* trial court. *See, e. g., Abandoning Aiding and Abetting* at 230 n.85. In the *Wessel* case the court sustained a directed verdict in favor of an independent accountant holding that he had no duty to disclose to prospective purchasers his knowledge of a corporation's irregular financial records.

> We find nothing in Rule 10b–5 that purports to impose liability on anyone whose conduct consists solely of inaction. On the contrary, the only subsection that has any reference to an omission, as distinguished from affirmative action, is a subsection (2) providing that it is unlawful "to omit to state a material fact necessary in order to make the statements made * * * not misleading," *i. e.*, an omission occurring as part of an affirmative statement. 437 F.2d at 283.

The lack of any significant conflict between *Brennan* and *Wessel*, however, became apparent in *Strong v. France*, 474 F.2d 747, 752 (9th Cir. 1973), where the Ninth Circuit explained silence or inaction might create liability if there is a duty to disclose.

> "An aider and abettor may be liable for damages even though his assistance of the scheme consists of mere silence or inaction." . . . That liability arises, however, only when a duty to disclose

may arise from the possession of "inside information" . . . or upon, "knowing assistance of or participation in a fraudulent scheme" . . . or upon a consent and approval of fraudulent practices by a director, . . . ." 474 F.2d at 752 (citations omitted).

As one commentator has pointed out, however, if liability is found for breach of a duty to disclose the violation of the federal securities laws rests upon an independent duty rather than an aiding and abetting theory. Ruder at 644. *Cf. Lewelling v. First California Co.*, 564 F.2d 1277, 1280 (9th Cir. 1977) ("Rule 10b–5 requires that those in possession of material information which is not generally available to the other party disclose before selling, or refrain from dealing. . . . Complete silence in the face of this duty is actionable."). *See generally Carr v. New York Stock Exchange, Inc.*, 414 F.Supp. 1292, 1299–1300 (N.D.Cal. 1976).

When these various aspects of aider or abettor liability are put together and applied to the case at hand it is apparent that George Powell cannot be held liable for his indirect participation in the preparation of the Gap Prospectus because he did not lend *substantial assistance* to a violation of § 10(b) and Rule 10b–5. Assuming for purposes of this motion that the first two paragraphs of the Prospectus narrative entitled "Merchandise Replenishment and Distribution" contained material misrepresentations for which certain individuals and/or the corporation would be liable, Powell's only assistance of the violation occurred when he may have read the paragraphs, appreciated their deceptiveness, and failed to take action. Characterizing his conduct as knowing or reckless makes no difference since the quantum of aid given is insufficient to prove a claim. If Powell did not owe a duty to prospective purchasers to disclose misrepresentations in the Prospectus, as this court previously determined, then his silence and inaction will not subject him to liability as an aider or abettor in this circuit. Furthermore, because Powell's participation was so minor the court need not decide the important question of whether aiding and abetting liability is limited to

violations of § 10(b) and Rule 10b–5. *Compare In re Equity Funding Corp. of America Securities Litigation*, 416 F.Supp. 161, 181 (C.D.Cal.1976); *with In re Caesars Palace Securities Litigation*, 360 F.Supp. 366, 378–84 (S.D.N.Y.1973).

As a final matter, Powell cannot be held liable as an aider or abettor on the pendent state claims because his silence and inaction did not, in the circumstances of this case, constitute substantial assistance or encouragement of another's wrongdoing. Similarly, he does not come within the coverage of California Corporations Code § 25504 because he was not a "principal executive officer," and, although he was an "employee of a person so liable," he did not "materially [aid] in the act or transaction constituting the violation."

For the reasons set forth above and for good cause shown, George Powell is entitled to summary judgment.

IT IS SO ORDERED.